Peter K. BARRY, Plaintiff,

v.

TIME, INC., a corporation; Quintin Dailey; Sports Illustrated Division of Time, Inc., a corporation; Does One through One Hundred, inclusive, Defendants.

No. C-83-4183-MHP.

United States District Court,
N.D. California.

April 5, 1984.

Marvin E. Lewis, Lewis & Lewis, San Francisco, Cal., for plaintiff.

James T. Fousekis, Donald D. Archer, Steinhart & Falconer, George G. Walker, San Francisco, Cal., for defendants.

## OPINION

PATEL, District Judge.

### I.

### FACTS

Plaintiff, Pete Barry ("Barry"), is the former head basketball coach at the University of San Francisco ("USF"). Defendant Quintin Dailey ("Dailey") was a star player on the USF basketball team, and is now a professional basketball player for the Chicago Bulls. This action for libel (against defendant Time, Inc.) and slander (against defendant Dailey) arises out of two articles in the July 26, 1982 and August 9, 1982 editions of *Sports Illustrated,* one of defendant Time's publications. These articles focus on USF's investigation of charges that Dailey had received improper payments, in violation of the rules of the National Collegiate Athletic Association ("NCAA"), from a company owned by J. Luiz Zabala, a USF supporter. Both articles also note that Dailey had recently pled guilty to aggravated assault charges against a female USF student. The controversy surrounding the allegations of illegal recruiting methods ultimately led the President of USF, the Reverend John Lo Schiavo, to cancel the men's basketball program in August of 1982.

The statements giving rise to the present lawsuit involve Dailey's accusation that the coach, Barry, was involved in the Zabala payments and had personally transmitted money to Dailey in violation of NCAA rules. This accusation was reported in both the July 26, 1982 and the August 9, 1982 articles. The articles in question also contain denials from Barry that he had ever been involved in any illegal or questionable payments to Dailey or any other player while he was coach.

Barry filed his original complaint *in propria persona.* That complaint elicited a motion to dismiss from the defendants, and Barry subsequently engaged counsel and filed a first amended complaint. The first amended complaint alleges that Dailey's statements were slanderous *per se,* and that the republication of these statements by Time was libelous *per se.* The first amended complaint further alleges that the articles were understood by some readers to imply that Barry had actually transferred money improperly to USF basketball players, and that *Sports Illustrated*'s report of a "scandal" and "shocking conditions" in the USF basketball program led readers to accept as true the assertion that Barry had been involved in improper payments to basketball players.

With regard to Time's state of mind in publishing the articles in question, it is claimed that Time was at least negligent in failing to exercise reasonable care to discover the falsity of the assertions contained in the articles. Moreover, it is alleged that the articles were published either with knowledge that they were false or with reckless disregard of whether they were false. Since the articles mention that Dailey was a convicted felon and had failed a polygraph test regarding the assault to which he ultimately pled guilty, it is claimed that Time subjectively entertained serious doubts as to the truth of Dailey's assertions that Barry improperly transmitted money to him.

The first amended complaint further alleges that Barry is not a public figure, since he "has never sought or assumed a role of especial prominence in the affairs of society," and "occupied no position of persuasive power or influence and ... never thrust himself to the forefront of any particular public controversy in order to influence the resolution of the issues involved." Barry prays for general damages in the

sum of $250,000.00, and punitive damages of $500,000.00.

By this motion, Time seeks to dismiss the first amended complaint for failure to state a claim upon which relief can be granted.[1] This motion is based on essentially four grounds: (1) Barry is a public figure, and therefore must plead "actual malice"; (2) the first amended complaint contains insufficiently specific allegations of malice to survive a motion to dismiss; (3) the accurate republication of Dailey's charges against Barry is constitutionally protected by the neutral reportage privilege; and (4) the publication of the articles in question is protected by the California fair comment privilege contained in Cal.Civ.Code § 47(3).

■ This court finds that Barry is at least a limited public figure with regard to comments concerning his position as head basketball coach at USF, and that the first amended complaint fails to plead "actual malice" with the requisite specificity to survive a motion to dismiss.[2] Moreover, summary judgment in favor of defendant Time is independently required by the constitutional privilege of neutral reportage, which this court finds protects the accurate republication of defamatory statements leveled by one participant in a public controversy against another participant in that controversy.[3]

1. Defendant Quintin Dailey is not a party to the instant motion, which seeks dismissal of the complaint as to Time only. Nothing in this opinion should be construed as expressing any indication as to the validity of Barry's slander action against Dailey.

2. Whether the plaintiff is a public figure is a question of law for the court. *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1293 n. 12 (D.C.Cir.1980), *cert. denied*, 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980).

3. Because this holding is premised on the neutral reportage privilege, there is no need for the court to consider the validity of Time's claim that the publication of the articles in question was also protected by California's "fair comment privilege." It should be noted, however, that California courts have held that the fair comment privilege codified in Cal.Civ.Code § 47(3) does not apply to the publication of a

## II.

## DISCUSSION

### A.  *Is Barry A Public Figure?*

In *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court held that public officials may not prevail in a defamation action unless they can prove "actual malice." That malice was described as being present when a defendant publishes a statement "with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279–80, 84 S.Ct. at 725–26.[4] The Court recognized that this strict standard would preclude recovery by some plaintiffs for erroneous and injurious statements, but felt that some false statements must be tolerated to ensure "that debate on public issues [is] uninhibited, robust, and wide-open ...." 376 U.S. at 270, 84 S.Ct. at 720.

In the companion cases of *Curtis Publishing Co. v. Butts* and *Associated Press v. Walker*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), the Court extended the rule of *New York Times* to apply to libel suits brought by "public figures." *Butts* involved an article accusing plaintiff, the athletic director of the University of Georgia, of conspiring to "fix" a football game between the University of Georgia and the University of Alabama. *Walker* involved

defamatory article by a national magazine of general readership, since such an article is not between "interested persons" within the meaning of the statute. *See Institute of Athletic Motivation v. University of Illinois*, 114 Cal.App.3d 1, 12, 170 Cal.Rptr. 411 (1980); *Rancho La Costa, Inc. v. Superior Court*, 106 Cal.App.3d 646, 665, 165 Cal.Rptr. 347 (1980), *cert. denied sub nom Penthouse International Ltd. v. Rancho La Costa*, 450 U.S. 902, 101 S.Ct. 1336, 67 L.Ed.2d 326 (1980).

4. In a later case, *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968), the Court held that "reckless disregard" is shown when there is "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." This subjective inquiry, by contrast to the neutral reportage analysis, does not readily permit disposition of a case on summary judgment. *See infra.*

the distribution of a news dispatch erroneously stating that plaintiff, a former Army officer who had been in charge of the federal troops during the school segregation confrontation at Little Rock, had personally led a charge against federal marshals and encouraged rioters to use violence during a riot at the University of Mississippi. The Court held that the *New York Times* "actual malice" standard should be extended to include criticism of nonpublic persons who "are nevertheless intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large." 388 U.S. at 164, 87 S.Ct. at 1996 (opinion of Warren, C.J., concurring in result). The Court found that Butts "may have attained [public figure] status by position alone," while Walker achieved his public figure status "by his purposeful activity amounting to a thrusting of his personality into the 'vortex' of an important public controversy...." 388 U.S. at 154–55, 87 S.Ct. at 1991 (opinion of Harlan, J.).

It was not until *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), however, that the Court made an authoritative attempt to define the term "public figure." In *Gertz*, a libel action was brought against the publisher of a magazine article describing plaintiff, a private attorney for a criminal defendant, as a "Communist" and a participant in various "Marxist" and "Red" activities. In balancing the need for a vigorous and uninhibited press against the legitimate state interest in compensating individuals for defamatory statements, the Court set up an analytical framework categorizing potential defamation plaintiffs based on several considerations.

■ One factor considered in the *Gertz* analysis is access to the media to correct factual misstatements: "Public officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy." 418 U.S. at 344, 94 S.Ct. at 3009.[5]

A second consideration affecting the balance between freedom of the press and protection of individuals from defamation rests on an "assumption of the risk" rationale:

> [T]here is a compelling normative consideration underlying the distinction between public and private defamation plaintiffs. An individual who decides to seek governmental office must accept certain necessary consequences of that involvement in public affairs. He runs the risk of closer public scrutiny than might otherwise be the case....
>
> Those classed as public figures stand in a similar position.

*Id.* at 344–45, 94 S.Ct. at 3009.

Having justified the differential treatment to be accorded public and private figures, the Court went on to create two

---

**5.** At least one court has noted that access to the media was not put forward as part of the *definition* of public figure status, but rather as a *rationale* for treating public and private figures differently. *See Harris v. Tomczak*, 94 F.R.D. 687, 699–700 (E.D.Cal.1982).

This court reads *Gertz* similarly. *Gertz* explicitly noted that "[b]ecause an *ad hoc* resolution of the competing interests at stake in each particular case is not feasible [the court] must lay down broad rules of general application," 418 U.S. at 343, 94 S.Ct. at 3009 and that even if the "generalities [set forth by the court] do not obtain in every instance, the communication media are entitled to act [on certain assumptions]." *Id.* at 345, 94 S.Ct. at 3010.

Access to the media may itself indicate that a person has become prominent, thus influencing the public figure determination, but it must consist of more than the opportunity to rebut false statements. *Hutchinson v. Proxmire*, 443 U.S. 111, 136, 99 S.Ct. 2675, 2688, 61 L.Ed.2d 411 (1979) (plaintiff not a public figure, in part because his access to the media was limited to responding to the alleged defamation, and was therefore not "the regular and continuing access to the media that is one of the accouterments of having become a public figure"); *see also* Comment, *Public Figures and the Passage of Time: Scottsboro Revisited in Street v. National Broadcasting Co.*, 34 Stan.L.Rev. 901, 909 n. 54 (1982). This court need not and does not decide today whether one may ever be a public figure without having "regular and continuing access to the media."

sub-classifications of public figures: persons who are public figures for all purposes, and persons who are public figures with regard to particular public controversies:

> For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment.

418 U.S. at 345, 94 S.Ct. at 3009. Put somewhat differently, a limited public figure is "an individual [who] voluntarily injects himself or is drawn into a particular public controversy and therefore becomes a public figure for a limited range of issues." 418 U.S. at 351, 94 S.Ct. at 3013. The relevant inquiry depends on "the nature and extent of an individual's participation in the particular controversy giving rise to the defamation." 418 U.S. at 352, 94 S.Ct. at 3013.

Both parties agree that Barry is not an all-purpose public figure, since there is no "clear evidence of general fame or notorie-ty in the community, and pervasive involvement in the affairs of society...." *Gertz*, 418 U.S. at 352, 94 S.Ct. at 3013.[6]

■ In determining whether Barry is a limited public figure, this court must first identify the public controversy. Cases subsequent to *Gertz* have begun to explain what constitutes a public controversy. It is clear, for example, that an essentially private dispute that attracts the public's interest will not suffice. In *Time, Inc. v. Firestone*, 424 U.S. 448, 454–55, 96 S.Ct. 958, 965–66, 47 L.Ed.2d 154 (1976), the Court held that plaintiff's divorce, although it had become a "cause celebre," was not a public controversy.[7]

Not only must the controversy be "public," but it must truly be a "controversy." In *Wolston v. Reader's Digest Association*, 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979), the Court noted that a public controversy did not exist with regard to plaintiff's failure to appear before a grand jury investigating Communism, since "there was no public controversy or debate in 1958 about the desirability of permitting Soviet espionage in the United States; all responsible United States citizens understandably were and are opposed to it." 443 U.S. at 166 n. 8, 99 S.Ct. at 2707 n. 8. *See also Rancho La Costa, Inc. v. Superior Court*,

6. Nor is it alleged that Barry is an "involuntary public figure" who has attained public figure status "through no purposeful action of his own ...." *Gertz*, 418 U.S. at 345, 94 S.Ct. at 3009. *See also Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1295 n. 18 (D.C.Cir.1980), *cert. denied*, 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980) (defining an "involuntary public figure" as one who has "[a]bandon[ed] his prominent position in society to return to anonymity, but [been subjected to] persistent press attention, most likely fueled by continuing public interest, [possibly] thwart[ing] his quest for privacy"). The Supreme Court has never explained what is meant in *Gertz* when it alluded to this hypothetical manner of becoming a public figure, and several commentators have questioned whether this category maintains any vitality. *See, e.g.*, Note, *The Involuntary Public Figure Class of Gertz v. Robert Welch: Dead or Merely Dormant?*, 14 U.Mich.J.L.Ref. 71, 83 (1980); Robertson, *Defamation and the First Amendment: In Praise of Gertz v. Robert Welch, Inc.*, 54 Tex.L.Rev. 199, 222–23 (1976).

7. This result was foreordained by the *Gertz* Court's rejection of the "newsworthiness" standard adopted by a plurality of the Court in *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971). The *Rosenbloom* plurality had affirmed a further extension of the actual malice standard to cases where the alleged defamation concerned an issue of "public or general interest." *Id.* at 80, 91 S.Ct. at 1837 (Marshall, J., dissenting opinion) *quoting* Warren & Brandeis, The Right to Privacy, 4 Harv.L.Rev. 193, 214 (1890). In rejecting this standard, the *Gertz* Court noted that the "newsworthiness" approach would unduly abridge the state's interest in protecting the reputation of a private individual from injury. *Gertz*, 418 U.S. at 346. Classifying the divorce in *Firestone* as a public controversy would have equated "'public controversy' with all controversies of interest to the public," thus reinstating the *Rosenbloom* doctrine. *Firestone*, 424 U.S. at 454, 96 S.Ct. at 965.

106 Cal.App.3d 646, 658, 165 Cal.Rptr. 347, *cert. denied sub nom. Penthouse International Ltd. v. Rancho La Costa*, 450 U.S. 902, 101 S.Ct. 1336, 67 L.Ed.2d 326 (1980) (plaintiff resort, which was reported to have links to organized crime, was not a public figure, in part because there was no controversy as to the desirability of fighting organized crime).

■ This court finds persuasive the definition of public controversy proferred by the court in *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287 (D.C.Cir.1980), *cert. denied* 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980):

> A public controversy is not simply a matter of interest to the public; it must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way....
>
> \*    \*    \*    :    :    \*
>
> To determine whether a controversy indeed existed and, if so, to define its contours, the judge must examine whether persons were discussing some specific question. [Footnote omitted].
> A general concern or interest will not suffice .... [The court] should ask whether a reasonable person would have expected persons beyond the immediate participants in the dispute to feel the impact of its resolution. [Footnote omitted]. If the issue was being debated publicly and if it had foreseeable and substantial ramifications for nonparticipants, it was a public controversy.

*Id.* at 1296–97. Under the *Waldbaum* definition, the public's interest in the controversy is a relevant but not dispositive factor. Only a controversy which attracts the public's interest because it affects persons other than the direct participants is a public

controversy. *See* Comment, *Public Figures and the Passage of Time: Scottsboro Revisited* in *Street v. National Broadcasting Co.*, 34 Stan.L.Rev. 901 (1982) (commenting favorably on *Waldbaum*).

■ Under the foregoing characterizations the court has no difficulty in finding that Barry was involved in a public controversy. The public controversy involved the alleged recruiting violations at USF prior to Barry's acceptance of the position of head basketball coach. The August 9, 1982 article, which is incorporated into Barry's first amended complaint, notes that USF had twice been investigated by the NCAA and had conducted at least one in-house investigation into alleged recruiting violations prior to the 1980–81 season, when Barry became coach. These investigations proximately led to the resignation of Coach Bob Gaillard in 1978, and to the firing of his successor, Dan Belluomini, in 1980. In appointing Barry to succeed Belluomini, President Lo Schiavo had insisted upon a "clean" program. "Bringing Down the Curtain," *Sports Illustrated*, August 9, 1982, at 65.

The outcome of this controversy could reasonably have been expected to have a significant impact on members of the USF community, since the reputation of their university was at stake.[8] *Cf. Waldbaum*, 627 F.2d at 1297 (defining public controversy). Moreover, although there may have been little or no dispute that violation of NCAA rules was improper, there certainly was a dispute as to what the University should *do* about allegations of recruiting violations.

Furthermore, this controversy must be viewed in the context of the larger public debate over the proper role of athletic pro-

---

**8.** Indeed, President Lo Schiavo, in announcing his decision to terminate USF's men's basketball program, made special mention of the effect which the past NCAA investigations had on the University's reputation:

> The circumstances centrally involve problems with the basketball program which have been plaguing us and which the university has been unsuccessfully trying to solve for many years. Those problems have put us in the position of

> defending ourselves before the NCAA Committee on Infractions twice in the past few years. The price the university has had to pay for those problems has been much greater than the heavy financial price. There is no way of measuring the damage that has been done to the university's most priceless assets, its integrity and its reputation.

"Bringing Down the Curtain," *Sports Illustrated*, August 9, 1982, at 64.

grams at institutions of higher learning. For many years, critics of bigtime collegiate athletics have commented on what they perceived to be the incongruity of a "win at all costs" attitude, and the concomitant infractions of NCAA rules such an attitude engenders at educational institutions which are at the same time attempting to instill some sense of civic virtue in their students. Conversely, supporters of major collegiate athletic programs have noted that such programs provide an opportunity for student-athletes to obtain an education which might otherwise be unavailable to them, while at the same time boosting school morale and providing needed revenues.[9]

This court finds that the "public controversy" requirement of *Gertz* is met in the present case by the existence of the specific controversy at USF surrounding the NCAA investigations of the athletic department, and by the intimately related nationwide controversy over the proper role of athletics at institutions of higher learning. This public controversy affects the lives of a large number of people.

■ The next step in determining whether Barry is a limited public figure requires an examination of the nature and extent of Barry's participation in the public controversy giving rise to the alleged defamation. *Gertz*, 418 U.S. at 352, 94 S.Ct. at 3013; *see also Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1297 (D.C.Cir.1980), *cert. denied* 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980).

■ The court must determine whether Barry falls within the *Gertz* definition of limited public figure because he "invite[d] attention and comment" by "thrust[ing] [himself] to the forefront of particular pub-

lic controversies in order to influence the resolution of the issues involved," 418 U.S. at 345, 94 S.Ct. at 3009 or because he "voluntarily inject[ed] himself" into a particular public controversy, or was "drawn into" a public controversy, 418 U.S. at 351, 94 S.Ct. at 3012–13. It was unclear from *Gertz* whether the Court meant to restrict limited public figure status to those who make an affirmative effort to influence the outcome of a public controversy, or whether, as the Court had previously suggested in *Butts*, one could be a limited public figure "by position alone." 388 U.S. at 155, 87 S.Ct. at 1991.

The Court's analysis of the limited public figure question in *Hutchinson v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979) and *Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979), is similarly unhelpful in determining whether one may be a limited public figure "by position alone." In *Hutchinson*, the Court considered whether a research director and professor who had received federal funding for animal research studies was a limited public figure with regard to a controversy which ensued when a United States Senator bestowed his "Golden Fleece" award upon plaintiff and referred to his studies as an example of wasteful government spending. The Court rejected the conclusion of the lower courts that Hutchinson was a public figure for the limited purpose of comment on his receipt of federal funds for research projects:

> Hutchinson did not thrust himself or his views into public controversy to influence others. . . .
>
> .    .    .    .    .

**9.** Frank D. Tatum Jr., one of the lawyers for USF and a former president of the United States Golf Association, commented in the August 9, 1982 article on the "conflicting forces" which exist in a big-time athletic program:

There are a lot of perceived pluses—recognition from the university, positive identification, support from alumni and non-alumni that transcends athletics, a positive impact on the student body. And it's fair to say that it's a way for young men to get an education they

wouldn't otherwise have access to and entry to a world that otherwise wouldn't be available to them . . . . The brutal fact, though, is that if you can't somehow manage to conduct the program within the rules, assuming the fact that you want to, then all the perceived pluses, every single one of them, turns into a painful minus. You can just kind of multiply all that for a religious institution.

"Bringing Down the Curtain," *Sports Illustrated*, August 9, 1982, at 65.

Moreover, Hutchinson at no time assumed any role of public prominence in the broad question of concern about expenditures. Neither his applications for federal grants nor his publications in professional journals can be said to have invited that degree of public attention and comment on his receipt of federal grants essential to meet the public figure level.

443 U.S. at 135, 99 S.Ct. at 2688.

In *Wolston*, the Court faced the issue of whether plaintiff, the nephew of admitted Russian spies, became a limited public figure by virtue of his failure to appear during a 1957–58 grand jury investigation of Soviet intelligence agents in the United States, and his subsequent citation for contempt. Finding that plaintiff had not "voluntarily thrust" or "injected" himself into any public controversy but rather had been "dragged unwillingly" into the investigation, and that he played "only a minor role" and "limited his involvement to that necessary to defend himself against the contempt charge," the Court found that he was not a limited public figure within the meaning of *Gertz*. 443 U.S. at 166–67, 99 S.Ct. at 2706–07.

In neither *Hutchinson* nor *Wolston*, however, was the Court faced with a situation where a person "invited attention and comment" by his decision to accept a position which, by its very nature, puts the holder of that position in the center of a public controversy. The scientist in *Hutchinson*, by applying for federal funding and publishing several articles, did not thereby assume the risk that he would become the subject of intense public scrutiny. Similarly, the plaintiff in *Wolston* did not choose to be the nephew of Russian spies, and his decision not to respond to the grand jury's subpoena was not motivated by a desire to influence the outcome of a public controversy but rather "appears simply to have been the result of his poor health." 443 U.S. at 168, 99 S.Ct. at 2708. Since neither plaintiff had voluntarily "relinquished ... his interest in the protection of his own good name," *Gertz*, 418 U.S. at 345, 94

S.Ct. at 3010, the state's interest in protecting them from defamatory falsehood was consequently stronger than the needs of the press.

In the present case, by contrast, Barry's voluntary decision to accept the position of head basketball coach at USF inevitably thrust him into the forefront of an already existing public controversy regarding alleged recruiting violations at USF. Barry was well aware that the two previous head basketball coaches at USF had lost their positions due to NCAA and university investigations into possible recruiting infractions, and he was also aware of President Lo Schiavo's desire to run a "clean" basketball program. This is not a case where further discovery is necessary to determine the plaintiff's particular role in the public controversy. *Cf. Woy v. Turner*, 533 F.Supp. 102, 105 (N.D.Ga.1981) (denying defendant's summary judgment motion because of dispute as to "voluntary nature and extent" of participation by plaintiff, a sports agent, in public controversy regarding highly publicized contract dispute). Barry's voluntary decision to become head basketball coach is a sufficient "thrust" within the meaning of *Gertz* to create limited public figure status, since the responsibilities of the position he accepted inevitably put him at the center of public attention regarding a continuing public controversy. As the *Waldbaum* court noted,

> Sometimes position alone can make one a public figure. *See Curtis Publishing v. Butts* [citations omitted]; *Chuy v. Philadelphia Eagles Football Club*, 431 F.Supp. 254, 267 (E.D.Pa.1977), *aff'd*, 595 F.2d 1265 (3d Cir.1979) (en banc). The position itself may be so prominent that any occupant unavoidably enters the limelight and thus becomes generally known in the community—a general public figure. Similarly, *the responsibilities of a position may include decision making that affects significantly one or more public controversies, in which case the occupant becomes a limited public figure for those controversies.*

*Waldbaum,* 627 F.2d at 1299–1300 n. 36 (emphasis added).[10]

This conclusion is consistent with a long line of cases, beginning with the Supreme Court's opinion in *Butts,* which have found professional and collegiate athletes and coaches to be public figures. *See e.g., Brewer v. Memphis Publishing Co.,* 626 F.2d 1238, 1254–55 (5th Cir.1980), *cert. denied,* 452 U.S. 962, 101 S.Ct. 3112, 69 L.Ed.2d 973 (1981); *Chuy v. Philadelphia Eagles Football Club,* 431 F.Supp. 254, 267 (E.D.Pa.1977), *aff'd,* 595 F.2d 1265, 1280 (3d Cir.1979); *Time, Inc. v. Johnston,* 448 F.2d 378, 380 (4th Cir.1971); *Vandenburg v. Newsweek, Inc.,* 441 F.2d 378, 379 (5th Cir.1971), *cert. denied* 404 U.S. 864, 92 S.Ct. 49, 30 L.Ed.2d 108 (1971); *Cepeda v. Cowles Magazines and Broadcasting, Inc.,* 392 F.2d 417, 419 (9th Cir.1968), *cert. denied,* 393 U.S. 840, 89 S.Ct. 117, 21 L.Ed.2d 110 (1968). Although some of these cases were decided before *Gertz* and arguably were based on the rejected *Rosenbloom* criterion of "newsworthiness," a common thread in these cases is that one's voluntary decision to pursue a career in sports, whether as an athlete or a coach, "invites attention and comment" regarding his job performance and thus constitutes an assumption of the risk of negative publicity.[11]

In *Johnston,* for example, the court considered whether a former professional basketball player, whose present status as a college coach depended upon public recollection of his career, was a public figure. In finding that plaintiff was a public figure, the court relied heavily on the symbiotic relationship which exists between the media and the field of sports:

> Certainly, he was as much a "public figure" as the plaintiff in *Cepeda* [professional baseball player] or as the plaintiffs in *Grayson* [*v. Curtis Publishing Co.,* 72 Wash.2d 999, 436 P.2d 756 (1967)] and *Cohen* [*v. Marx,* 94 Cal.App.2d 704, 211 P.2d 320 (1949)] [basketball coach and professional boxers, respectively]. *He had offered his services to the public as a paid performer and had thereby invited comments on his performance as such. In a sense, he had assumed the risk of publicity, good or bad, as the case might be, so far as it concerned his public performance.* The publication in question related strictly to his public character ... [I]t discussed him in connection with a public event in which plaintiff as a compensated public figure had taken part voluntarily.

448 F.2d at 380 (emphasis added).[12]

Further support for his position can be found in *Chuy v. Philadelphia Eagles Football Club,* 431 F.Supp. 254 (E.D.Pa. 1977), *aff'd,* 595 F.2d 1265 (3d Cir.1979) (en banc). Plaintiff in *Chuy* was a professional football player who had played six years

---

**10.** This court agrees with the *Waldbaum* court that it is improper to characterize certain positions as always being public, since such labelling is tantamount to making subject-matter classifications, which have been disapproved by the Supreme Court. *See Hutchinson v. Proxmire,* 443 U.S. 111, 135, 99 S.Ct. 2675, 2688, 61 L.Ed.2d 411 (1979) *citing Time, Inc. v. Firestone,* 424 U.S. 448, 456, 96 S.Ct. 958, 966, 47 L.Ed.2d 154 (1976). Rather, courts should analyze in each case whether the acceptance of a particular position, under the circumstances, is sufficient to create limited public figure status. *See Waldbaum,* 627 F.2d at 1299–1300 n. 36.

**11.** This court is well aware that some team sports, whether at the collegiate or professional level, generate little or no publicity and thus call into question the observation that a decision to pursue a career in sports is tantamount to an assumption of the risk of negative publicity. Accordingly, this decision expresses no opinion as to whether all coaches or athletes of collegiate or professional athletic teams are limited public figures.

**12.** *Johnston,* like *Vandenburg* and *Cepeda,* was decided before *Gertz* and therefore did not attempt to relate plaintiff's public figure status to the existence of a public controversy. After *Gertz,* it is clear that one cannot become a limited public figure unless the "public controversy" requirement is met. *See Brewer v. Memphis Publishing Co., Inc.,* 626 F.2d 1238, 1254 (5th Cir.1980) ("A sports or entertainment career does not necessarily involve any public controversy."). It is, of course, entirely possible that an athlete or coach may have achieved such a degree of notoriety and influence as to become an all-purpose public figure, obviating the need to find a public controversy. The present fact situation plainly does not present such a case.

for another team before being traded to the Eagles in 1969. During his first season as an Eagle, Chuy sustained a serious shoulder injury which brought his career in football to an end. Chuy subsequently became embroiled in a contract dispute with the Eagles regarding the club's obligation to pay Chuy his full salary for the two years following his injury. Reporting on the dispute, a sports columnist erroneously recounted that Chuy was suffering from a rare blood condition which was potentially life-threatening.

In discussing Chuy's libel claim, both the trial court and the Third Circuit found that Chuy was a public figure, at least with regard to comments about his ability to continue playing professional football:

> Where a person has, however, *chosen* to engage in a profession which draws him regularly into regional and national view and leads to "fame and notoriety in the community," even if he has no ideological thesis to promulgate, he invites general public discussion ...: If society chooses to direct massive public attention to a particular sphere of activity, those who enter that sphere inviting such attention must overcome the *Times* standard ... This is especially so in this case where the subject matter pertained to Donald Chuy's ability to continue playing professional football, a matter in which the sports loving public had a not insignificant interest.

431 F.Supp. at 267 (emphasis in original). The Third Circuit, relying on the "drawn into" language from *Gertz*, echoed this theme:

> Professional athletes, at least as to their playing careers, generally assume a position of public prominence. Their contractual disputes, as well as their athletic

accomplishments, command the attention of sports fans. Chuy, in particular, was a starting player for the Eagles. He had gained special prominence for being involved in a major and well-publicized trade ... His injury was sustained on the field and led to discovery of a physical condition which forced his retirement. With all this as background, Chuy's dispute with the Eagles in the 1970 offseason concerning payment of two years' salary was no mere private contractual matter. *Chuy had been thrust into public prominence long before Dr. Nixon's statements appeared* in the April, 1970 Bulletin, and we have no difficulty in concluding as a matter of law that he was a public figure ... at least with respect to his ability to play football.

595 F.2d at 1280 (emphasis added). The court went on to distinguish the case from *Firestone*, which involved a well-publicized but essentially private marital dispute: "Although the marital troubles of the wealthy do not make them public figures, a professional athlete's contractual troubles relating to his playing performance commands the attention of a more sustained and wider audience." [13] *Id.* at 1280–81 n. 21.

Finally, in *Brewer v. Memphis Publishing Co., Inc.*, 626 F.2d 1238 (5th Cir.1980), *cert. denied*, 452 U.S. 962, 101 S.Ct. 3112, 69 L.Ed.2d 973 (1981), the court had to determine the status of two plaintiffs: a woman who had gained media exposure and fame through her entertainment career and her well-publicized romantic involvement with Elvis Presley; and her husband, a former professional athlete whose football career made his name well-known enough to "open business opportunities for

---

**13.** The analysis in *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265 (3d Cir.1979) (en banc), is not without problems. Using general public figure criteria, the court described Chuy as a public figure, "at least with respect to his ability to play football." *Id.* at 1280. It did not go on to define the public controversy at issue. *Chuy* suggests that the *Gertz* test should not be applied woodenly, and that there may be persons whose fame is pervasive in a particular field or profession and who are public figures with respect to that field, without regard to whether there is a particular existing controversy. *See Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1299–1300 n. 36 (D.C.Cir. 1980) *cert. denied*, 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980); *Brewer v. Memphis Publishing Co., Inc.*, 626 F.2d 1238, 1249–50 n. 15 (5th Cir.1980), *cert. denied*, 452 U.S. 962, 101 S.Ct. 3112, 69 L.Ed.2d 973 (1981).

him for the rest of his life." 626 F.2d at 1248.

Even though the allegedly libelous article concerned the plaintiffs' marital status rather than their status as performers, the court, in an extremely scholarly opinion, focused instead on the increased risk of exposure voluntarily accepted by performers in finding that plaintiffs were public figures:

> We therefore focus instead on plaintiffs' actions in seeking publicity or voluntarily engaging in activities that necessarily involve the risk of increased exposure and injury to reputation. *Both entered professions that by their nature require public appearances and invite press attention.*

626 F.2d at 1254 (emphasis added).

■ Although *Johnston, Chuy* and *Brewer* all involved plaintiffs who were former professional athletes, the analysis does not change when the plaintiff is the head basketball coach at a prominent university. Barry voluntarily accepted a position which inevitably made him the focal point of substantial media attention with regard to his team. Given USF's recent history, this media attention expectably concerned not only the team's performance on the basketball court, but also Barry's performance in conducting the basketball program within NCAA rules. Under the circumstances of this case, it is manifest that Barry is a limited public figure required to prove "actual malice."

B. *Are The Allegations of "Actual Malice" In The First Amended Complaint Sufficiently Specific?*

■ In *Barger v. Playboy Enterprises, Inc.,* 564 F.Supp. 1151 (N.D.Cal.1983), *aff'd* on other grounds, 732 F.2d 163 (9th Cir. 1984), this court considered the sufficiency of a complaint which alleged primarily that defendant publisher failed to investigate adequately an article's allegations regarding the sexual activities of "Hell's Angels brides" and "mommas." The court dismissed the complaint for failure to plead "actual malice" with sufficient specificity.

In dismissing the action the court relied upon an earlier decision of the Ninth Circuit, *Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Board of Culinary Workers,* 542 F.2d 1076 (9th Cir.1976), *cert. denied,* 430 U.S. 940, 97 S.Ct. 1571, 51 L.Ed.2d 787 (1977), which had declined to apply the liberal pleading standards of the Federal Rules of Civil Procedure to cases alleging first amendment violations:

> The Ninth Circuit has held that where plaintiff challenges
>
> > conduct which is prima facie protected by the First Amendment, the danger that the mere pendency of the action will chill the exercise of First Amendment rights required more specific allegations than would otherwise be required.

*Barger,* 564 F.Supp. at 1154, *quoting Franchise Realty,* 542 F.2d at 1082–83. This court went on to opine that although *Franchise Realty* was inconsistent with *Williams v. Gorton,* 529 F.2d 668, 671–72 (9th Cir.1976), *aff'd without opinion,* 566 F.2d 1186 (9th Cir.1977), it followed *Williams* and was "better reasoned." *Barger,* 564 F.Supp. at 1154.

Plaintiff attempts to distinguish *Franchise Realty* on the ground that it was an antitrust case. However, as Time argues, the *Franchise Realty* court was concerned with defendant labor union's first amendment right to freedom of association. In holding that more specific pleading was required, the court relied upon two Supreme Court cases, *Time, Inc. v. Hill,* 385 U.S. 374, 387–91, 87 S.Ct. 534, 541–44, 17 L.Ed.2d 456 (1967) and *New York Times Co. v. Sullivan,* 376 U.S. 254, 267–83, 84 S.Ct. 710, 719–27, 11 L.Ed.2d 686, which recognized the potential chilling effects of harrassing litigation concerning the first amendment. *Franchise Realty,* 542 F.2d at 1082. Hence it is simply incorrect for plaintiff to assert that the policy considerations which existed in *Franchise Realty* are not found in the present case.

The pleading deficiencies in this case bear a marked similarity to those in *Bar-*

*ger*, and dismissal of the first amended complaint for failure to plead actual malice with sufficient particularity is therefore required. Here, as in *Barger*, plaintiff's claim of recklessness is bottomed in part on a failure to investigate, which the Supreme Court has held is insufficient to establish reckless conduct. *St. Amant v. Thompson*, 390 U.S. 727, 730–31, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). As in *Barger*, plaintiff claims that defendant's duty to investigate was higher because the article in question was based on statements from an unreliable source. However, as the *Barger* court noted, a publisher's knowledge of a source's disreputable character is not necessarily sufficient to put him on notice of probable falsity, and the publisher acts responsibly by not concealing from the reader facts which tend to impugn the source's credibility:

> Ironically, plaintiffs charge that facts about the article's source revealed in the article itself should have led Playboy to entertain serious doubts about its probable falsity. Plaintiffs claim that the article shows that Black took the drug "speed," committed armed bank robberies, lied and was mentally unstable. Plaintiffs ask the court to assume these parts of the article were true in order to show that the parts they object to were published with knowledge of probable falsity.

*Barger*, 564 F.Supp. at 1156–57. Noting that the article when viewed in context "does not depict [the source] as a liar, except insofar as it describes his efforts to preserve his 'cover,'" *id.* at 1157, the court went on to observe that the publisher attempted to provide an accurate presentation of all relevant information pertaining to the informant's credibility, allowing the readers to make up their own minds. *Id.*

Plaintiff makes much of Dailey's failure to pass a lie detector test. However, as in *Barger*, the *Sports Illustrated* articles in

question did not conceal from readers the factors about Dailey which might affect his credibility. The articles prominently mention that Dailey pled guilty to aggravated assault on a USF student, and that he failed a lie detector test concerning his participation in the assault. Furthermore, the August 9, 1982 article contains several quotations from acquaintances of Dailey which are highly critical of his conduct and character. The articles thus allow *Sports Illustrated* readers to decide for themselves whether or not to believe Dailey's accusations. Under the circumstances, Time acted responsibly in printing Dailey's comments, and was plainly not in derogation of its duty to investigate.[14]

Nor does the fact that Time elicited a denial of the charges from Barry indicate that Time acted recklessly. Rather than demonstrating that Time "entertained serious doubts" as to the truth of Dailey's accusations, the elicitation and publication of a denial from Barry suggests responsible journalism insofar as it presents a balanced, neutral picture of this particular public controversy. Indeed, as the next section will discuss in more detail, *Barger*'s analysis leads this court to adopt the doctrine of the constitutional privilege of neutral reportage.

C. *Is Time Protected by the Constitutional Privilege of Neutral Reportage?*

American courts have traditionally refused to distinguish between publishers and republishers of defamatory statements, on the theory that "tale bearers are as bad as tale makers." *McDonald v. Glitsch, Inc.*, 589 S.W.2d 554, 556 (Tex.Civ.App.1979), *quoting Houston Chronicle Publishing Co. v. Wegner*, 182 S.W. 45, 48 (Tex.Civ. App.1915); *see also* Prosser, *Handbook of the Law of Torts* § 113, at 768–69 (4th ed. 1971); Restatement (Second) of Torts § 578

---

**14.** The first amended complaint also attaches significance to Time's use of Dailey as its "sole source of information." Apart from the fact that Time obviously talked to many people regarding Dailey's allegations of recruiting viola-

tions, including Barry himself, "use of a single source does not establish recklessness." *Barger*, 564 F.Supp. at 1157, citing *New York Times Co. v. Connor*, 365 F.2d 567, 576 (5th Cir.1966).

(1977); Note, *The Developing Privilege of Neutral Reportage,* 69 Va.L.Rev. 853 (1983).

In *Edwards v. National Audubon Society, Inc.,* 556 F.2d 113 (2d Cir.), *cert. denied sub nom. Edwards v. New York Times Co.,* 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977), the Second Circuit elucidated for the first time [15] a constitutional privilege of neutral reportage, under which a republisher who accurately and disinterestedly reports certain defamatory statements made against public figures is shielded from liability, regardless of the republisher's subjective awareness of the truth or falsity of the accusation.

*Edwards* considered whether liability could be imposed upon the *New York Times* for publishing an article which accurately reported an accusation of the National Audubon Society that certain scientists were "being paid to lie, or ... parroting something [they knew] little about." The newspaper account quoted Audubon Society officials who identified five prominent scientists as the persons attacked, and also contained denials from the three defamed scientists who could be reached for comment. These accusations were reported in the context of an already acrimonious public controversy over the use of DDT. 556 F.2d at 117.

Both sides conceded that the *Times* had accurately reported both the substance of the Audubon Society publication and the names of the five scientists accused of being "paid liars." Under these circumstances, the Second Circuit found that a libel judgment against the *Times* was constitutionally impermissible:

> Succinctly stated, when a responsible, prominent organization like the National Audubon Society makes serious charges against a public figure, the First Amendment protects the accurate and disinterested reporting of those charges, regardless of the reporter's private views regarding their validity. [Citations omitted]. What is newsworthy about such accusations is that they were made. We do not believe that the press may be required under the First Amendment to suppress newsworthy statements because it has serious doubts regarding their truth. Nor must the press take up cudgels against dubious charges in order

---

**15.** Although *Edwards* purported to draw on two earlier cases, *Time, Inc. v. Pape,* 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971) and *Medina v. Time, Inc.,* 439 F.2d 1129 (1st Cir.1971), these cases are not generally regarded as adopting a constitutional privilege of neutral reportage. *See e.g., Medico v. Time, Inc.,* 643 F.2d 134, 144 (3d Cir.1981), *cert. denied,* 454 U.S. 836, 102 S.Ct. 139, 70 L.Ed.2d 116 (1981); Note, *The Developing Privilege of Neutral Reportage,* 69 Va.L.Rev. 853, 863 n. 51 (1983); Comment, *Edwards v. Audubon Society, Inc.: A Constitutional Privilege to Republish Defamation Should be Rejected,* 33 Hast.L.J. 1203, 1212–14 (1982); Sowle, *Defamation and the First Amendment: The Case for a Constitutional Privilege of Fair Report,* 54 N.Y.U.L.Rev. 469, 501–08 (1979); *but see* Eaton, *The American Law of Defamation Through Gertz v. Robert Welch, Inc., and Beyond: An Analytical Primer,* 61 Va.L.Rev. 3149, 1362 n. 46 (1976). *Pape* arose from a *Time* article that quoted excerpts from a government report listing in detail allegations against Pape contained in a civil complaint. The article accurately quoted the allegations, but neglected to say that they were contained in a civil complaint. The result, Pape alleged, was that Time falsely asserted that the government commission had charged that he was guilty of policy brutality.

The Court concluded that Time had not engaged in a "falsification" sufficient to warrant a jury finding of actual malice, since the truth of a publication is separable from the question of whether the publisher had an adequate basis for believing in the truth of the publication. 401 U.S. at 285, 91 S.Ct. at 637. *Pape* did not consider whether Time would have been liable if the government commission *had* in fact charged *Pape* with policy brutality and Time had republished this charge, and hence *Pape* cannot be read as supporting a constitutional privilege of neutral reportage.

*Medina* relied on *Pape* for its finding that a *Time* article republishing an allegation that Medina had killed a little boy during the My Lai massacre could not support a jury finding of actual malice: "The plaintiff does not claim the Time article 'truncated or distorted' the statements it reported .... Conceding this lack of 'falsification,' the plaintiff's cause of action ... must fail." *Medina,* 439 F.2d at 1130, citing *Pape,* 401 U.S. at 279, 91 S.Ct. at 633. Although *Medina* reached the same result as neutral reportage cases, it did not frame its analysis in terms of a constitutional privilege which applies independent of the republisher's subjective state of mind.

to publish them without fear of liability for defamation. [Citations omitted]. The public interest in being fully informed about controversies that often rage around sensitive issues demands that the press be afforded the freedom to report such charges without assuming responsibility for them.

*Id.* at 120. The court emphasized the requirement of neutrality, noting that "a publisher who in fact espouses or concurs in the charges made by others, or who deliberately distorts these statements to launch a personal attack of his own on a public figure, cannot rely on a privilege of neutral reportage. In such instances he assumes responsibility for the underlying accusations." *Id.*

■■■ The court is well aware that, since *Edwards,* many courts have declined to adopt the privilege of neutral reportage, or have severely circumscribed its application. *See* Note, *The Developing Privilege of Neutral Reportage,* 69 Va.L.Rev. 853, 863–65 (1983) (and cases cited). The rationale most commonly advanced for rejection of the privilege is that the "newsworthiness" element in *Edwards* conflicts with the Supreme Court's rejection in *Gertz* of the *Rosenbloom* "newsworthiness" test. *Id.* at 863; *see also Dickey v. CBS, Inc.,* 583 F.2d 1221, 1226 n. 5 (3d Cir.1978); *Newell v. Field Enterprises, Inc.,* 91 Ill.App.3d 735, 47 Ill.Dec. 429, 446–47, 415 N.E.2d 434, 451–52 (1980). Other courts have concluded that the privilege is superfluous,

since the press is already adequately protected by the "actual malice" standard which must be met by public figure plaintiffs. *See e.g., Postill v. Booth Newspapers, Inc.,* 118 Mich.App. 608, 325 N.W.2d 511, 517–18 (1982).[16] And at least one court has suggested that *Edwards* is inconsistent with the Supreme Court's holding in *St. Amant,* since the neutral reportage privilege applies even though the reporter may entertain "serious doubts" about the veracity of the accusations being republished. *Dickey v. CBS, Inc.,* 583 F.2d 1221, 1225 (3d Cir.1978).[17]

This issue is one of first impression in this circuit. Neither the Ninth Circuit nor any of the district courts in the circuit appears to have either adopted or rejected the privilege of neutral reportage. Nor is this court persuaded that *Gertz, St. Amant* or any other Supreme Court pronouncement precludes recognition of the privilege.

■■■ Having carefully reviewed the arguments touching on all aspects of the issue as expressed by judges and commentators, this court finds itself in agreement with Judge Kaufman that "[t]he public interest in being fully informed about controversies that rage around sensitive issues demands that the press be afforded the freedom to report such charges without assuming responsibility for them." *Edwards,* 556 F.2d at 120; *see also Fisher v. Larsen,* 138 Cal.App.3d 627, 642, 188 Cal. Rptr. 216 (1982), *cert. denied,* — U.S. ——, 104 S.Ct. 390, 78 L.Ed.2d 335 (1983);

---

16. The obvious difference between the privilege of neutral reportage and the "actual malice" standard is that the former applies regardless of the defendant's subjective state of mind, while the latter requires that the defendant have actual knowledge of falsity or that he entertain serious doubts as to the truth. A derivative, more practical difference is that the existence of the privilege of neutral reportage can be decided on summary judgment, while the "actual malice" inquiry cannot. *See Hutchinson v. Proxmire,* 443 U.S. 111, 120 n. 9, 99 S.Ct. 2675, 2680 n. 9, 61 L.Ed.2d 411 (1979) (since proof of "actual malice" calls a defendant's subjective state of mind into question, summary disposition is inappropriate). The resolution of meritless defamation actions at the summary judgment phase is not only a great practical advantage for defendants, but it also comports with frequent judicial observations about the chilling

effect of pending defamation suits. *See e.g., Barger v. Playboy Enterprises, Inc.,* 564 F.Supp. 1151, 1154 (N.D.Cal.1983); *Wasserman v. Time, Inc.,* 424 F.2d 920, 922–23 (D.C.Cir.) (Wright, J., concurring), *cert. denied,* 398 U.S. 940, 90 S.Ct. 1844, 26 L.Ed.2d 273 (1970); *see also* Note, *The Developing Privilege of Neutral Reportage,* 69 Va.L.Rev. 853, 869 n. 85 (1983).

17. Although the Third Circuit appeared to have squarely rejected the neutral reportage privilege in *Dickey,* a subsequent Third Circuit case, *Medico v. Time, Inc.,* 643 F.2d 134, 145 (3d Cir.1981), *cert. denied,* 454 U.S. 836, 102 S.Ct. 139, 70 L.Ed.2d 116 (1981), cast doubt on the continued vitality of its language in *Dickey* by explicitly noting that its comments about *Edwards* in that case were only dicta, and observing that the question remains open in that circuit.

*Krauss v. Champaign News Gazette,* 59 Ill.App.3d 745, 17 Ill.Dec. 78, 79, 375 N.E.2d 1362, 1363 (1978); *Orr v. Lynch,* 60 A.D.2d 949, 401 N.Y.S.2d 897, 899 (1978), *aff'd mem.,* 45 N.Y.2d 903, 411 N.Y.S.2d 10, 383 N.E.2d 562 (1978).

Recognition of the public's "right to know" that serious charges have been made against a public figure is an important application of the Supreme Court's concern that "debate on public issues be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964). If a republisher may be held liable for passing on newsworthy but defamatory information to the public, it is likely that he will decline to publish this information for fear that his doubts will later be characterized as "serious" and therefore actionable. Even if he does not fear ultimate liability, the mere threat of costly and time-consuming inquiry into his state of mind may cast a chilling effect on publication. Comment, *Restricting the First Amendment Right to Republish Defamatory Statements:* Cianci v. New York Times Publishing Co., 69 Geo.L.J. 1495, 1512 (1981). In this way, the public will be deprived of the opportunity to make informed judgments with respect to public controversies.

■ Contrary to the conclusions of some courts the privilege, as defined, does not call into play the kind of *ad hoc* determinations of "newsworthiness" that concerned the *Gertz* court. 418 U.S. at 346, 94 S.Ct. at 3010. Under *Gertz* and its progeny, the court must already engage in the evaluation of whether the plaintiff is a public figure and what constitutes a public controversy. In order to apply the neutral reportage doctrine the court in addition need only assess whether the defamer is a party to the controversy and whether the report is accurate and neutral.

Plaintiff argues that the *Edwards* privilege does not apply to the facts of this case, since Dailey is not a "responsible,

prominent organization [or individual]," but rather is a convicted felon who has failed a lie detector test. In other words, plaintiff contends that the neutral reportage privilege requires an assessment by the press of the credibility of an alleged defamer.

Very few courts have addressed the issue of whether the neutral reportage privilege applies when the underlying defamation was not made by a "responsible and prominent" organization or individual.[18] In *Fogus v. Capital Cities Media, Inc.,* 111 Ill.App.3d 1060, 67 Ill.Dec. 616, 444 N.E.2d 1100 (1982), the court considered a newspaper's liability for reporting allegations by certain "unnamed youths" that they had been "abused" by the police. The court held that the constitutional privilege of neutral reportage was restricted to cases where the underlying defamation was attributable to a "responsible, prominent person or organization." 67 Ill.Dec. at 618, 444 N.E.2d at 1102. The court went on to distinguish the case at hand from an earlier Illinois case, in which the defamatory allegations were made by a locally prominent politician:

In those cases which have recognized the doctrine [of neutral reportage], it has been because it applied in this limited manner. In *Edwards,* the allegations in question were made by an official of the National Audubon Society, "a responsible prominent organization." [Citations omitted]. Likewise, in *Krauss* [*v. Champaign News Gazette,* 59 Ill.App.3d 745, 17 Ill.Dec. 78, 375 N.E.2d 1362, 1364 (Ill.App.1978)] the allegations were made by an assistant State's Attorney, a locally prominent figure .... In the instant case, on the other hand, the allegations of police misconduct were made by unnamed youths who had been arrested by police. The doctrine of neutral reportage does not aid the defendants under these facts.

*Id.* This court does not read *Fogus* as denying the privilege because the defamers

---

**18.** Although *Edwards* spoke only of "organizations," 556 F.2d at 120, there is no logical or constitutional basis for differentiating between organizations and individuals in this context. *See* Note, *The Developing Privilege of Neutral*

*Reportage,* 69 Va.L.Rev. 853, 865 n. 64 (1983). Plaintiff does not and could not argue that Time is precluded from asserting the neutral reportage privilege merely because of Dailey's status as an individual.

were not "trustworthy," but rather because they were "unnamed" and there was thus no means by which readers of the article could discern the veracity of the allegations. In *Krauss*, by contrast, the privilege applied not because the State's Attorney was inherently more believable than the defamers in *Fogus*, but rather because the State's Attorney, being a public figure, was well-known in the community and the members of the public could therefore judge for themselves whether or not to believe his accusations. *Fogus* and *Krauss* thus do not stand for the proposition that a defamer must be "trustworthy" in order for the privilege to apply, but rather that the defamer must be "prominent." [19]

More on point than *Fogus* is *Oliver v. Village Voice, Inc.*, 417 F.Supp. 235 (S.D. N.Y.1976), decided before *Edwards*. In *Oliver*, the court considered defendant newspaper's liability for quoting an identified "Watergate investigator" to the effect that plaintiff was involved with the CIA. It appeared through deposition testimony that, while the article attributed the statements to a Watergate investigator, Rosenbaum, the real source of the information was Howard Hunt. Plaintiff argued that defendant was reckless to rely upon anything known to have emanated from Hunt, "give his dubious reputation for reliability." 417 F.Supp. at 238. The court, presaging the Second Circuit's adoption of a full-fledged constitutional privilege in *Edwards*, found that Hunt's reliability was irrelevant, since the mere fact of his having made the statement was newsworthy:

> The fact that the subject matter was speculative and the statements in question controverted is not sufficient to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. *Although plaintiff emphasizes Hunt's alleged unreliability as a source, the mere fact of his making a statement, given his prominent position in the Watergate*

*controversy, would be a legitimate news story.* Accepting plaintiff's argument would impermissibly stifle investigative reporting into controversial areas such as Watergate where fact and rumor tend to converge in the elusive search for the truth.

*Id.* (emphasis added); *Cf. McManus v. Doubleday & Co.*, 513 F.Supp. 1383, 1391 (S.D.N.Y.1981) (though not repudiating *Oliver*, holding that *Edwards* does not apply to investigative reporting because *Edwards* is aimed at the freer reporting of raging controversies).

This court is of the opinion that the neutral reportage privilege does not depend solely upon the "trustworthiness" of the individual or organization making the allegedly defamatory statements. Neither *Edwards* nor *Fogus*, nor any other case, advance a cogent policy reason for differentiating among defamers on the basis of their trustworthiness or credibility. Indeed, the primary rationale of *Edwards* —the public interest in being fully informed about public controversies—is inconsistent with such a differentiation. Moreover, it could create a chilling effect on the members of the press if they were required to be the arbiters of how "trustworthy" a source is. *See* Comment, *Constitutional Privilege to Republish Defamation*, 77 Colum.L.Rev. 1266, 1277 (1977) ("Forcing a reporter to determine the responsibility of an organization, at the risk of substantial liability, would seemingly have a chilling effect on dissemination."). A much more sensible approach is to extend the neutral reportage privilege to *all* republications of serious charges made by one participant in an existing public controversy against another participant in that controversy, regardless of the "trustworthiness" of the original defamer. This approach is more consistent with providing the public with "full information" about public controversies.

This interpretation of the neutral reportage privilege is foreshadowed by this

---

**19.** These cases imply, therefore, that if the accusation that Barry had participated in recruiting violations had come from an anonymous USF student or a "man on the street," Time would be barred from asserting the neutral reportage privilege. Since Dailey is clearly a "prominent" individual, this court need not address this hypothetical situation.

court's decision in *Barger v. Playboy Enterprises, Inc.*, 564 F.Supp. 1151 (N.D.Cal. 1983). In that case the court rejected plaintiffs' claim that facts about the article's source, revealed in the article itself, should have led Playboy to entertain serious doubts about the article's probable falsity. Instead, the court found that

> the publisher responsibly did not conceal from its readers the factors about Black which might affect his credibility. Instead, it enabled its readers to exercise their own judgment. It would be unfortunate indeed if such disclosures laid publishers open to increased liability. The potential chilling effect is obvious.

564 F.Supp. at 1157.

■ Although the *Barger* ruling concerned the subjective awareness of falsity standard necessary to show malice, the principle which emerges from *Edwards* and *Barger*, when read in harmony with *Edwards*, is that *it is the neutrality of the report* which is critical. So long as the publisher does not "espouse or concur in the charges" or "deliberately distort" the charges, protection against defamation claims should be afforded. *Edwards*, 556 F.2d at 120. In this way, the public, not the press, is the ultimate arbiter of the truth of accusations made during the course of a public controversy.

■ The neutral reportage privilege, so construed, is not without limitations. It cannot be used as an absolute privilege to republish defamatory statements about purely private persons not already caught up in a public controversy. The privilege applies where the defamed person is a public figure, whether general or limited purpose, who is involved in an existing controversy, and the defamatory statement is made by a party to that controversy. The republication must be accurate and neutral. While the rationale justifying the neutral reportage privilege may apply equally to non-public plaintiffs involved in an existing controversy, the court need not reach that issue here.[20]

It is clear from the foregoing that Time's republication of Dailey's accusations against Barry is constitutionally protected by the privilege of neutral reportage. Plaintiff concedes that the articles in question accurately report the accusations made by Dailey against Barry. Furthermore, plaintiff does not and could not assert that the articles present an unbalanced or one-sided picture of the public controversy over alleged recruiting violations at USF. As in *Edwards*, Time elicited and published a denial from Barry that he had ever been involved in any illegal or questionable payments to Barry or any other USF basketball player. As in *Barger*, Time responsibly did not conceal from its readers facts about Dailey which tended to impugn his credibility, such as his guilty plea to aggravated assault charges and his failure to pass a lie detector test regarding the assault. Under the circumstances, this court finds that the public's interest in knowing that Dailey, a central actor in the public controversy concerning alleged recruiting violations at USF, made such serious accu-

---

**20.** In announcing the neutral reportage privilege, the *Edwards* court made reference to the fact that the plaintiff in that case was a public figure. It has never been entirely clear, however, whether the privilege would apply if the subject of the defamation were a private individual rather than a public figure. Several courts have read *Edwards* to mean that the privilege may only be asserted against a public figure plaintiff. *See e.g., Dixson v. Newsweek, Inc.*, 562 F.2d 626, 631 (10th Cir.1977); *McCall v. Courier-Journal & Louisville Times Co.*, 623 S.W.2d 882, 894 (Ky.1981), *cert. denied*, 456 U.S. 975, 102 S.Ct. 2239, 72 L.Ed.2d 849 (1982); *see also Makis v. Area Publications Corp.*, 77 Ill.App.3d 452, 32 Ill.Dec. 804, 812, 395 N.E.2d 1185, 1193 (1979) (Romiti, J., dissenting). This limitation upon the privilege has met with severe criticism from commentators, who note that under some circumstances the public may have a *greater* interest in knowing that a prominent organization or individual had made serious charges against a private individual, since the making of such charges against a defenseless plaintiff gives the public relevant insight into the defamer's character. *See e.g.*, Comment, *Restricting the First Amendment Right to Republish Defamatory Statements*: Cianci v. New Times Publishing Co., 69 Geo.L.J. 1495, 1517 n. 130 (1981); Note, *Protecting the Public Debate: A Proposed Constitutional Privilege of Accurate Republication*, 58 Tex.L.Rev. 623, 637–38, 640 (1980). Since this court finds that Barry is a public figure, it is unnecessary to resolve this difficult question at the present time.

sations against Barry, another key participant in the controversy, outweighs Barry's interest in preventing the incremental diminution of his reputation which may have occurred following republication of Dailey's allegedly defamatory remarks.

Independent of the first amended complaint's failure to plead actual malice with sufficient specificity, therefore, this court concludes that summary judgment in favor of Time must be granted.[21]

IT IS SO ORDERED.

---

**21.** Although Time moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6), since matter outside the pleadings has been submitted and considered, this court treats the neutral reportage issue as a motion for partial summary judgment under Fed.R.Civ. 56.