**In re UNITED PRESS INTERNATIONAL,**
**Debtor.**

Civ. No. 89–0561 (CRR).

United States District Court, District of Columbia.

Sept. 1, 1989.
As Amended Sept. 22, 1989.

Robert Merce, Schutter & Glickstein, Honolulu, Hawaii, Duane D. Morse, Wilmer, Cutler & Pickering, Washington, D.C., for plaintiff.

Paul Alston, Robyn B. Chun, Mei Nakamoto, Paul, Johnson, Alston & Hunt, Honolulu, Hawaii, Bruce W. Sanford, Leonard H. Freiman, Baker & Hostetler, Washington, D.C., for defendant.

OPINION

CHARLES R. RICHEY, District Judge.

United Press International ("UPI"), the debtor in this action, has moved for summary judgment on Larry Mehau's claim for

damages. The dispute arises out of allegedly defamatory statements that a UPI reporter sent over the UPI wire in 1977. Mehau, then a member of Hawaii's Board of Land and Natural Resources, claims that the statements soiled his name by linking him to underworld activity in Hawaii. For the reasons stated herein, UPI's motion for summary judgment shall be granted.

## A. *Factual Background*

On June 15, 1977, *The Valley Isle*, a bi-weekly, Honolulu-based newspaper (now defunct), published a story on the recent death of George Helm, a Hawaiian environmental activist. The *Valley Isle* story strongly implied that Helm and another man had been killed by local underworld figures. The story included an interview with Adolph Helm, George's brother; Adolph claimed in the interview that George had told him and others before his death that he had unearthed strong evidence of underworld influence in Hawaii politics. Adolph further stated that George had told a group of approximately 100 people that Larry Mehau was the "Godfather" of organized crime in Hawaii. Adolph also recounted an incident at a local restaurant in which, according to George, Mehau had personally threatened to "break George's ass" unless George ceased his efforts to uncover local corruption. George Helm disappeared off the coast of a Hawaiian island on March 7, 1977.

Dennis Stone, a UPI reporter, became aware of the *Valley Isle* story on the date of its publication. The record indicates that the question of mob influence in Hawaii politics had generated some media interest in the preceding months. Stone had been aware of this interest, and upon learning of the *Valley Isle* story, he regarded it as an opportunity to "scoop" the competition.[1] Stone immediately called the *Maui News* newspaper, where an unidentified

employee read to him portions of the *Valley Isle* story. Stone then called the Press Secretary of the Governor of Hawaii and asked for comment on the *Valley Isle* story. The Press Secretary had no information on the story or its contents. After unsuccessfully attempting to reach Adolph Helm, Stone spoke with the Helms' father, George Sr., who confirmed that George had discussed threats from Larry Mehau. Based upon these discussions, Stone sent the following story over the national wire:

> Adolph Helm ... brother of the missing Hawaiian activist George Helm ... was quoted today in the biweekly Valley Isle Press as naming State Land Board Big Island member Larry Mehau as the "Godfather" of Hawaii's underworld crime. Adolph Helm also was quoted as reveling [sic] that his brother, now feared dead, said Mehau threatened him when Helm was a musician at Honolulu's Gold Coin restaurant. The Helm brothers' father confirmed that George Helm said he was repeatedly threatened. Before he apparently died, George Helm told his brother he had a lot to reveal about Hawaii's organized crime. Adolph Helm also reportedly fingered Marcus Lipske, believed the manager of singer Don Ho, as the local underworld's link with the mainland syndicate.[2]

After distributing this first story, Stone was able to make contact with Adolph Helm. Adolph confirmed to Stone that the substance of the *Valley Isle* story accurately reflected what he had told the *Valley Isle* reporters.[3] Stone was also able to obtain a copy of the *Valley Isle* and read the story for himself. He thereafter sent the following over the UPI wire, approximately an hour after the first story:

> Adolph Helm, the brother of the missing and feared dead

---

1. Stone Dep. at 52.

2. Exh. 8 to UPI Mem. (ellipses in original).

3. Mehau submitted an affidavit in which he stated that Adolph Helm later met with him and complained that the *Valley Isle* had misquoted and distorted his comments. However,

Adolph's deposition, taken after the meeting with Mehau, shows that Adolph was comfortable with the *Valley Isle* story, and believed that it fairly reflected his views. Helm Dep. at 24–29. In any event, as will be shown, this dispute is not material to the legal issues underlying the Court's ruling.

Hawaiian activist George Helm, revealed today that George Helm told many of his follwers [sic] that State Board of Land and Natural Resources member Larry Mehau of the Big Island is the Godfather of Hawaii's underworld. Helm, interviewed at his Molokai residence, said his brother told 40 to 50 people prior to a March "invasion" of Kahoolawe that Mehua [sic] and other people—quote— "higher up" were deeply involved in organized crime. Helm quoted his brother as saying he was planning to expose them and "all the corruption that was happening." Helm's apparent death this past March is believed being investigated by Maui County and the FBI.[4]

The next day, on June 16, UPI distributed a story detailing Governor George Ariyoshi's strong defense of Mehau and his categorical rejection of the *Valley Isle* story.

The record indicates that Stone was a relatively inexperienced reporter, and that he distributed the Mehau story on his last day with UPI. It appears that he knew next to nothing of the *Valley Isle* at the time he distributed his stories.[5] The record further indicates that while the *Valley Isle* story and Stone's releases gained the attention of some members of the local media, others deemed the information unreliable and refused to report the *Valley Isle* story.[6]

Mehau brought this defamation action in Hawaii state court against UPI and several other defendants on June 23, 1977. After approximately two years of discovery, the trial court granted summary judgment in UPI's favor. On appeal, however, the Supreme Court of Hawaii reversed, finding that the record contained sufficient facts from which a reasonable jury might find, under *New York Times Co. v. Sullivan*, 376 U.S. 254, 270–71, 84 S.Ct. 710, 720–21,

11 L.Ed.2d 686 (1964), that Stone acted with actual malice when he sent the two stories over the UPI wire. *Mehau v. Gannett Pacific Corp.*, 66 Haw. 133, 658 P.2d 312 (1983). The Hawaii Supreme Court's opinion dealt only with the actual malice standard as applied to the record before it.

On remand, additional discovery led to the dismissal of several defendants. Afterward, the posture of the parties allowed removal of the case to the United States District Court for the District of Hawaii. In April of 1985, after remand and additional discovery, Mehau stipulated to the dismissal of his claims against all non-diverse defendants, leaving only UPI in the case. On May 16, 1985 UPI filed with the state court a Notice of Bankruptcy Petition and Automatic Stay. On May 17, 1985 UPI removed the suit to the United States District Court for the District of Hawaii. In turn, the Bankruptcy Court *sua sponte* requested a withdrawal of the reference of Mehau's claim because it raised the prospect of a jury trial. The matter came to this Court, and UPI's motion for summary judgment is now ripe for decision.

### B. *Analysis*

UPI offers two basic arguments in support of its motion for summary judgment. First, surveying the evidence, UPI contends that the record lacks any rational basis for a finding (1) that Stone acted with actual malice under *New York Times Co. v. Sullivan* when he distributed the two stories, or (2) that Mehau has carried his burden of proving the falsity of Stone's statements by clear and convincing evidence. Second, UPI contends that, regardless of Mehau's evidentiary showing, Stone's comments are absolutely privileged under the doctrine of neutral reportage; a theory first enunciated by the Second Circuit in *Edwards v. National Audubon Society*, 556 F.2d 113 (2d Cir.1977). Because the Court

---

**4.** Exh. 7 to UPI Mem.

**5.** At his deposition, Scott indicated that when he distributed the stories, "the entirety" of his knowledge of the *Valley Isle* was "that they had run this story and that it was a bi-weekly newspaper on the island of Maui." Scott Dep. at 49.

**6.** For instance, Robert Sevey, a reporter with KGMB–TV in Honolulu, refused to report the *Valley Isle* story because of his doubts as to the newspaper's reliability. *See* Sevey Dep. at 10–11.

is in partial agreement with UPI as to its first argument, and in total agreement as to its second, the Court will grant UPI's motion.

### 1. Insufficiency of the Evidence
#### A. *Actual Malice*

UPI first contends that no reasonable juror could find, from the facts presented in the record, that Stone transmitted the two stories over the UPI wire with actual malice. Derived from *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the actual malice standard requires (in this case) that Mehau show by clear and convincing evidence that Stone acted either "with knowledge that [the statements] were false," or "with reckless disregard of whether [they were] false or not." *Id.* at 279–80, 84 S.Ct. at 726. If Mehau cannot make this showing, the "central meaning of the first amendment," *id.* at 273, 84 S.Ct. at 722, compels dismissal of his claim.

While this Court's independent review of the record might produce a different result, the Supreme Court of Hawaii has already applied the actual malice standard to the facts of this case. And that court has concluded that a reasonable juror might find Stone's actions to have been undertaken with reckless disregard for the statement's accuracy, and thus with actual malice under *New York Times. Mehau v. Gannett Pacific Corp.*, 66 Haw. 133, 147–

48, 658 P.2d 312 (1983).[7] The Supreme Court's decision on this particular question is the law of the case.

The Supreme Court's decision concededly rests upon a determination of federal law (i.e., a federal defense to a state law claim). This factor generally militates against a finding that a state court determination should control after the matter has been removed to federal court. Nevertheless, a careful reading of the Supreme Court's decision shows that the Supreme Court carefully applied—indeed presaged by some three years—the currently controlling law in this area. Contrary to UPI's assertion, the United States Supreme Court's subsequent decisions in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), do not somehow invalidate the Supreme Court of Hawaii's decision on the actual malice issue. The Court agrees with UPI that *Liberty Lobby* and *Celotex* altered the law of summary judgment in various respects. Nevertheless, it appears to the Court (1) that the Supreme Court of Hawaii applied precisely the test set forth in *Liberty Lobby*,[8] and (2) that the rule of *Celotex* has no bearing upon this case. Thus, the Court declines to accept UPI's contention that recent developments in federal law—i.e., the *Liberty Lobby* and *Celotex* decisions—warrant disruption of the Supreme Court's decision in *Mehau*.

---

7. The Supreme Court of Hawaii expressed its views as follows:

> UPI's treatment of the information gleaned from another source, the fact that the source was a new publication apparently given to sensationalizing the "news," and the anonymity of the authors of some of the crucial accusations published by the Valley Isle are a few of the factors we believe could lead to a finding by a jury that UPI's republication of the charges of criminality was not "made in good faith" or they were such that "only a reckless man would have put them in circulation." *St. Amant v. Thompson*, 390 U.S. [727] at 732[, 88 S.Ct. 1323 at 1326, 20 L.Ed.2d 262].
> *Id.*

8. Summarized, the rule of *Liberty Lobby* might be stated as follows: (1) on summary judgment, a court is to review the non-movant's evidentiary showing through the prism of the substantive

standard that would control at a trial on the merits; and (2) in determining which factual disputes are "material," the court is to give credence only to those facts upon which a *reasonable* juror might base a finding for the non-movant (in other words, the summary judgment standard is essentially the same as the directed verdict standard). With this in mind, consider the Supreme Court's statement in *Mehau* that on summary judgment in a defamation action a court "examines the evidence, taking all permissible inferences and resolving questions of credibility in plaintiff's favor to determine whether *a reasonable jury acting reasonably could find actual malice with convincing clarity.*" *Mehau*, 66 Haw. at 145, 658 P.2d at 321 (quoting *Nader v. Toledano*, 408 A.2d 31, 50 (D.C.1979) (emphasis in original). It appears to the Court that this standard is precisely that set forth in *Liberty Lobby*.

The values expressed in the law of the case doctrine are more compelling. While UPI might disagree with the Supreme Court's conclusion in *Mehau,* the fact that the proper standard appears to have been applied is sufficient reason to leave undisturbed a thoroughly reasoned decision of the highest court of Hawaii.

### B. *Burden of Proving Falsity*

■ The Supreme Court of Hawaii, however, did not address the second of UPI's "evidentiary" contentions—that Mehau has failed to carry his burden of proving the falsity of Stone's statements.[9] UPI's argument is based upon *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986). In *Hepps,* the United States Supreme Court effectively interposed an additional "element" that a plaintiff must prove in order to surmount a *New York Times* defense: not only must a plaintiff show that challenged statements were made with actual malice, a plaintiff must show as well that the statements were false. UPI argues that the record lacks any proof that Stone's statements were false. The Court agrees; no reasonable juror could find by a fair preponderance of the evidence that the statements Stone sent over the national wire were false.[10] Summary judgment in UPI's favor is therefore compelled.

The Court is perfectly willing to draw from the record the conclusion that Mehau is not a mobster; that he is not the "Godfather" of the Hawaii underworld. A reasonable juror could do the same. The issue, however, is not whether Mehau was or was not affiliated with the underworld. The issue is whether Mehau has offered sufficient evidence that the two statements Stone sent over the UPI wire on June 15, 1977, were inaccurate. He has not.

It is crucial to consider precisely what Stone's statements said. The first, issued at 12:55 p.m., reported the fact that the *Valley Isle* had released a story in which Adolph Helm had revealed his brother George's view that Mehau was the "Godfather" of the Hawaii underworld. The second story, issued at 1:50 p.m., after Stone had actually spoken with Adolph Helm, simply reported once again the fact that Adolph Helm had stated that his brother George had told others that Mehau was involved with organized crime in Hawaii. The stories involve the reporting of, first, the substance of the *Valley Isle* story, and, second, the substance of Adolph Helm's comments to the *Valley Isle* and to Stone himself. Both stories make abundantly clear that the Helm brothers—and not Stone—were leveling the charges against Mehau. In a sense, the stories are tantamount to the reporting of two physical events: (1) Adolph's statements to the *Valley Isle;* and the *Valley Isle*'s subsequent repeating of those statements in its edition of June 15, 1977.

Mehau has offered nothing to indicate that those physical events did not occur. There is no dispute that the *Valley Isle* printed a story on June 15, 1977, in which Adolph Helm reported his brother's view that Mehau was a member of the Hawaii underworld. The *Valley Isle* did print such a story. To be sure, Mehau attacks the

---

**9.** The Supreme Court of Hawaii did indicate that it regarded Stone's stories as potentially misleading. 66 Haw. at 146–47, 658 P.2d at 321–22. Yet, the Supreme Court's statements were dicta, and were made in connection with its discussion of recklessness under the actual malice standard. They do not represent a holding that Mehau had satisfied his burden of proving falsity.

**10.** UPI asserts that Mehau must prove falsity under *Hepps* by clear and convincing evidence. UPI Mem. at 16. In *Robertson v. McCloskey,* 666 F.Supp. 241, 248 (D.D.C.1987), Judge Joyce Hens Green of this Court did conclude, for persuasive reasons, that the *Hepps* analysis commands clear and convincing evidence. Never-

theless, in at least two opinions after *Robertson,* the Court of Appeals for the District of Columbia has stated that the preponderance of the evidence standard applies with respect to the *Hepps* falsity determination. *Liberty Lobby, Inc. v. Rees,* 852 F.2d 595, 598 (D.C.Cir.1988) (dictum); *Liberty Lobby, Inc. v. Dow Jones & Co., Inc.,* 838 F.2d 1287, 1292 (D.C.Cir.1988) (Bork, J.) ("at least a fair preponderance of the evidence"). This Court will thus assume that the preponderance of the evidence is applicable, although, given the Court's conclusion that Mehau has failed to make even this less stringent showing, the choice of standards is without great significance.

first sentence of Stone's first story, which begins: "Adolph Helm ... was quoted today ... as naming State Land Board Big Island member Larry Mehau as the "Godfather" of Hawaii's underworld crime." In a purely technical sense, this assertion is incorrect. Adolph Helm did not himself "name" Mehau; rather, Adolph only repeated to the *Valley Isle* his brother's view that Mehau was connected to the underworld. Yet, in the Court's view, this technical error does not rise to the level of "falsity" contemplated under *Hepps. Cf., Time, Inc. v. Pape*, 401 U.S. 279, 290, 91 S.Ct. 633, 639–40, 28 L.Ed.2d 45 (1971) ("falsification" for purposes of actual malice standard). *See also Tavoulareas v. Piro*, 817 F.2d 762, 787 (D.C.Cir.1987) (minor inaccuracies cannot "in reason and in law" support liability for defamation); *Restatement (Second) of Torts* § 581A, comment f (1977) ("It is not necessary [for a defendant] to establish the literal truth of the precise statement made. Slight inaccuracies of expression are immaterial provided that the defamatory charge is true in substance.").[11]

As for Stone's second story, Mehau has offered no evidence that Adolph Helm did *not* tell Stone, after Stone contacted Helm at his Molokai residence, that his brother George "had told many of his followers that [Mehau] ... is the Godfather of Hawaii's underworld," or that Helm did *not* tell Stone of the other matters contained in the second story. Quite the contrary, Adolph Helm's deposition testimony indicates that Helm confirmed to Stone that he had spoken with the *Valley Isle*, and that the *Valley Isle* had accurately reported his comments.[12] There is some question as to precisely what *types* of questions Stone asked Helm when they spoke, but this dispute in no way suggests that Adolph Helm did not "reveal" on June 15 the matters contained in the second story.[13]

In the Court's view, no reasonable juror could find that Mehau has proven by "a fair preponderance of the evidence" that either of Stone's stories were "false" within the meaning of *Hepps*. Mehau has offered nothing to indicate that the events and statements described in Stone's stories did not occur, or that Stone did not depict those events and statements with substantial accuracy. Summary judgment must be granted in UPI's favor. *See Liberty Lobby v. Dow Jones, Inc.*, 838 F.2d 1287, 1294–96 (D.C.Cir.1988) (where no reasonable juror could find challenged statements false, summary judgment granted in defendant's favor).

**2. Neutral Reportage**

■ Notwithstanding the foregoing, UPI also argues that Stone's stories are absolutely immune from defamation liability under the neutral reportage doctrine. The Court agrees.

The neutral reportage doctrine finds its genesis in *Edwards v. National Audubon Society*, 556 F.2d 113 (2d Cir.) *cert. denied*, 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977). In *Edwards*, the Second Circuit held defamation liability "constitutionally impermissible" where the defendant, the *New York Times*, had merely reported charges levelled by the National Audubon Society against certain scientists. As "succinctly stated" by Judge Kaufman, "when a responsible, prominent organization like the National Audubon Society makes serious charges against a public figure, the First Amendment protects the accurate and disinterested reporting of those charges,

---

**11.** The same conclusion applies as a matter of law to the fact that, while the *Valley Isle* story recounted only one incident in which Mehau allegedly threatened George Helm, Stone's first story claimed that Helm's father had said that George had been "repeatedly" threatened by Mehau. Even if erroneous, Stone's statement is not "false" as a matter of law under *Hepps*.

**12.** Helm Dep. at 40.

**13.** Mehau relies upon a meeting following all of this between himself and Adolph Helm at which Helm is alleged to have retracted his statements to the *Valley Isle* and to have claimed that he was misquoted by the *Valley Isle*. Mehau Aff. (February 11, 1980). Although Helm's deposition contradicts Mehau's affidavit, the Court would decide no differently even if Mehau's affidavit were absolutely correct. While it might be relevant to the accuracy of the *Valley Isle* story, nothing in Mehau's affidavit impugns in any way the accuracy of Stone's stories.

regardless of the reporter's private views regarding their validity." *Id.* at 120.

The Court of Appeals for the District of Columbia has yet to speak regarding the neutral reportage doctrine, *see White v. Fraternal Order of Police*, 707 F.Supp. 579, 596 (D.D.C.1989), and those circuits that have considered the doctrine have left its contours rather ill-defined. For instance, in an *en banc* decision shortly after *Edwards*, the Second Circuit itself expressed some concerns with the doctrine's potential breadth. *See Cianci v. New Times Pub. Co.*, 639 F.2d 54, 69 (2d Cir. 1980) ("The need for the careful limitation of a constitutional privilege for fair reportage is demonstrated by the breadth of that defense, which confers immunity even for publishing statements believed to be untrue."). And the Third Circuit has expressly declined to follow *Edwards*. *Dickey v. CBS, Inc.*, 583 F.2d 1221, 1225–26 (3d Cir. 1978).[14] The Eighth Circuit, by contrast, appears to have adopted a relatively expansive conception of the doctrine, permitting its application even when the author makes clear his or her personal views on the reported matter. *Price v. Viking Penguin, Inc.*, 881 F.2d 1426, 1434 (8th Cir.1989) (Heaney, S.J.). In this Court's view, the logic of the doctrine, coupled with the weight of federal precedent, favor adoption of a neutral reportage doctrine in this circuit. However, as the ambiguity surrounding the content of the doctrine indicates, what the Court adopts is less than perfectly clear.

Among the undefined aspects of the privilege is the weight to be given each of the factors Mehau relies upon in opposing UPI's motion for summary judgment. Mehau's argument rests upon the specific facts and language of *Edwards* itself. In *Edwards*, Judge Kaufman's language arguably limited the doctrine's use to cases in which the initial "defamer" is a "respon-sible, prominent organization like the National Audubon Society." 556 F.2d at 120. Mehau contends that because the initial "defamers" were the *Valley Isle* and Adolph Helm, and because neither of them were "responsible" or "prominent" in the sense that the National Audubon Society was in *Edwards*, UPI cannot rely upon the doctrine in this case.

Judge Kaufman may well have intended to limit the doctrine through his choice of language in *Edwards*. *See also Cianci*, 639 F.2d at 68. Nevertheless, this Court is of the view that such a limitation to the reiteration only of statements of "responsible" or "prominent" "defamers" is inconsistent with the *raison d'etre* of the doctrine. It is essential that the press be at liberty to report serious charges against public officials without excessive concern for the source. Were the press secure only in reporting the charges of "responsible" or "prominent" persons or entities—with these terms undoubtedly defined in light of the values of some established class—the "robust and unintimidated press" for which Judge Kaufman showed such concern would undoubtedly suffer.[15]

This Court is more comfortable with the views expressed in Judge Patel's carefully reasoned opinion in *Barry v. Time, Inc.*, 584 F.Supp. 1110, 1122–28 (N.D.Cal.1984). In *Barry*, Judge Patel rejected an argument identical to Mehau's, and held that "a more sensible approach is to extend the neutral reportage privilege to *all* republications of serious charges by one participant in an existing public controversy against another participant in that controversy, regardless of the 'trustworthiness' of the original defamer." *Id.* at 1126. Judge Patel properly noted that "*it is the neutrality of the report* which is critical." *Id.* at 1127. If neutrality is maintained, the public—as opposed to the reporter or a judge—

---

14. *But see Medico v. Time, Inc.*, 643 F.2d 134, 145–46 (3d Cir.1981) (while not repudiating *Dickey*, noting that Pennsylvania Supreme Court might be inclined to adopt neutral reportage doctrine in light of the "trend of federal case law" supporting such a privilege).

15. *See Edwards*, 556 F.2d at 120 ("if we are to enjoy the blessings of a robust and unintimidated press, we must provide immunity from defamation suits where the journalist believes, reasonably and in good faith, that his report accurately conveys the charges made.").

can serve as the final arbiter of the trustworthiness of the defamer and his statements. *Id.* The First Amendment, it seems to the Court, demands no less. Accordingly, having interpreted the neutral reportage doctrine in this fashion, the Court finds that the status of the *Valley Isle* and Adolph Helm as "unresponsible" or "unprominent" [16] does not negate application of the neutral reportage doctrine in this case.

The second basis upon which Mehau would avoid UPI's neutral reportage defense in this case is through reliance upon the fact that, in *Edwards*, the reporter "in good faith elicited both sides of the story to the best of his ability." *Id.* at 118. Mehau contends that, unlike the reporter in *Edwards*, Stone simply reiterated the *Valley Isle*'s charges without undertaking an independent investigation of their possible inaccuracy, and without attempting to present Mehau's response. The distinction between the facts in *Edwards* and the facts here, according to Mehau, deprives UPI of the right to rely upon the neutral reportage doctrine.

The Court cannot agree. The undisputed facts indicate that Stone did make adequate efforts to verify the *Valley Isle* story. His stories did no more than repeat *only* that which he had verified; as noted above, he reported only that individuals (who he named) had made statements to the *Valley Isle*, and that the *Valley Isle* had published those statements. In light of the constitutional concerns underlying the neutral reportage doctrine, the Court finds these efforts legally sufficient.

■ As for Stone's duty to report "both sides," it appears to the Court that such an obligation is essentially an incident of the requirement, clearly expressed in *Edwards*, that a reporter not espouse or concur in the matter reported.[17] *See, e.g., Cianci*, 639 F.2d at 69 (failure to report both sides, including the withholding of information in author's possession, effectively caused report to espouse charges). Accordingly, such an obligation does not arise when, as here, the report is itself essentially factual, neutral and accurate.[18] Clearly, reporting "both sides" may eliminate any risk that a report will be construed as endorsing a reported charge; but when, as here, reporting both sides *adds* nothing to the neutrality of a simple and straightforward story, it is not (or should not be) required. A close reading of *Edwards*—appropriate in light of Mehau's reliance upon the literal language of the opinion—makes clear that, in Judge Kaufman's view, reporting both sides is not a prerequisite to the neutral reportage defense; the fair, accurate and neutral reiteration of the charges is the key. In the Court's view, Stone's reports were that: fair, accurate and neutral. Good journalistic practice certainly suggests reporting all aspects of a controversy, and Stone's releases would have been better had they contained opposition to the *Valley Isle* story. But the absence of such opposition, at least under these circumstances, does not deprive UPI of the right to rely upon the neutral reportage doctrine.

■ What we are left with, then, are two reports that accurately and neutrally reported serious charges made against a public figure regarding a matter of great pub-

---

16. The Court recognizes that *Barry* dealt only with the question of whether a defamer need be "responsible," and did not address whether he or she need be "prominent." In that case, the court expressly found that the original defamer (basketball player Quentin Dailey) was "prominent." In the Court's view, however, there should be no requirement that an original defamer be either "responsible" *or* "prominent." A prominence requirement is essentially an additional safeguard of trustworthiness, and, as noted above, trustworthiness of the defamer is not (or should not be) a prerequisite to the neutral reportage defense.

17. *See Edwards*, 556 F.2d at 120 ("a publisher who in fact espouses or concurs in the charges made by others, or who deliberately distorts these statements to launch a personal attack of his own on a public figure, cannot rely on a privilege of neutral reportage").

18. Clearly, this rule cannot be absolute; the more factually involved and one-sided a report is, the greater becomes the reporter's obligation to report both sides of the story. The reports in this case, however, can hardly be characterized as involved: they were one paragraph statements of the fact that charges had been made.

lic interest.[19]  Regardless of the accuracy of the underlying charges, the Court is of the view that Stone's decision to distribute those stories over the UPI wire is absolutely protected under the neutral reportage doctrine.  Summary judgment in UPI's favor is appropriate.

### C.  Conclusion

The Court agrees with Mehau that the Supreme Court of Hawaii's decision on the actual malice issue forms the law of the case and should not be disturbed.  Nevertheless, with respect to issues not addressed by the Supreme Court of Hawaii, the undisputed facts indicate that Mehau has failed to prove by a fair preponderance of the evidence that Stone's reports are false.  Further, the undisputed facts indicate that Stone's reports are absolutely protected under the neutral reportage doctrine, which the Court adopts herein for the first time in this circuit.  Accordingly, the Court will grant summary judgment in UPI's favor.[20]  An Order shall issue.

19.  Mehau also argues that the neutral reportage doctrine, as articulated in *Edwards*, requires that the reported charges must relate to a long-standing dispute of great public interest.  He contrasts the facts of *Edwards*, in which the dispute over DDT use had been raging for a number of years, with this case, in which, he claims, there had been little prior public interest in the subject matter of Stone's report.  Yet, a fair reading of *Edwards* in no way indicates a *requirement* that the issues raised have been in the public eye for an extended period of time.  Concededly, Judge Patel in *Barry* seems to require that there be an "existing public controversy" before a defendant can invoke the privilege.  584 F.Supp. at 1127.  To the extent *Barry* can be read to impose such a requirement, however, this Court declines to follow that portion of Judge Patel's analysis.  So long as charges are serious and "newsworthy," *Edwards*, 556 F.2d at 120, the press should enjoy the freedom to report them without regard for the "history" of the dispute.  Again, the public—and not the

20.  Mehau also asks that further discovery be permitted under Fed.R.Civ.P. 56(f) before a ruling on UPI's motion for summary judgment.  This litigation, however, has been alive for over 12 years (albeit with a stay of several years on account of UPI's bankruptcy).  This period has provided ample time within which the parties could have undertaken all necessary discovery.  The only legal issue which could conceivably have "surprised" Mehau is the Court's decision under *Hepps*, which arguably established a new federal rule of decision in 1986.  Yet, Mehau's own brief states his view that the *Hepps* rule "has always been the law and certainly does not represent a dramatic shift in determining how defamation cases should be resolved."  Mehau Mem. at 18.  There is accordingly no basis for further postponing a decision on the merits in this action.