Nicholas COLINIATIS, Plaintiff,

v.

Simos C. DIMAS, Dimas & Johnston, and The National Herald, Defendants.

No. 92 Civ. 8372(SWK).

United States District Court, S.D. New York.

May 28, 1997.

---

Paul H. Appel, New York City, for Plaintiff.

Marshall C. Berger, New York City, for Defendant The National Herald.

KRAM, District Judge.

This action for libel and tortious interference with employment arises out of a letter written by a law firm to its client containing allegations that plaintiff Nicholas Coliniatis ("Coliniatis") was involved in an illegal kickback scheme. On July 25, 1996, Magistrate Judge Ronald L. Ellis issued a Report and Recommendation (the "Report") recommending that defendant The National Herald's motion for summary judgment be denied, and that both parties' motions for sanctions pursuant to Federal Rule of Civil Procedure 11 be denied. In accordance with Federal Rule of Civil Procedure 72(b) and 28 U.S.C. § 636(b)(1)(C), the Court reviews *de nova* those portions of the Report to which the parties have objected.

## BACKGROUND [1]

### I. The Allegations

Olympic Airways ("Olympic") is the national airline of the Republic of Greece and is owned by the Greek government under the supervision of the Greek Cabinet. Olympic is a highly visible entity within the Greek–American community and is widely considered to be the most important corporation

---

1. Unless otherwise indicated, the following statement of facts is taken from the pleadings and the parties' Rule 3(g) Statements.

**514**

within that community. Deposition of Nicholas Coliniatis, dated July 25, 1995, at 122.

Coliniatis was employed by Olympic for twenty-eight years, from 1964 until he was terminated in March 1993. Deposition of Nicholas Coliniatis, dated Feb. 28, 1995, at 13. From 1989 to 1992, Coliniatis served in New York City as the Director of Operations for North and South America, Olympic's highest and most prestigious overseas position. During this period, Coliniatis was responsible for Olympic's public relations in the United States generally and in particular in the Greek–American community. Coliniatis's duties in New York included: oversight of budgetary and financial matters; employment of service providers to Olympic; retainment of legal counsel; purchase of advertising space; and the general management of Olympic's affairs throughout North and South America. Complaint at ¶ 9. In performing these functions Coliniatis was assisted by the Olympic public relations department in Athens and a Greek–American public relations consultant, Demetrius Filios. In this connection, Coliniatis held press conferences and Olympic's New York office issued press releases.

On November 28, 1991, the Olympic board of directors approved the sale of its leasehold interest in its New York headquarters located at 647 Fifth Avenue in Manhattan to Olympic Towers Associates for $9,000,000. On September 16, 1992, Olympic, through Coliniatis, purchased two midtown Manhattan buildings for a total of $7,000,000 in order to house its new offices. The real estate broker in the purchase transaction, Eastern Consolidated Properties, Inc. ("Eastern"), was to receive a 6% commission. Defendant Dimas & Johnston is a law firm that provided legal services to Olympic from 1983 to 1992, including representing Olympic in these transactions. Defendant Simos C. Dimas ("Dimas") is a partner at Dimas & Johnston. Olympic also retained Nicholas Sfouggatakis ("Sfouggatakis"), a licensed real estate broker and certified public accountant, to provide tax advice in connection with the purchase of the buildings. Sfouggatakis had an agreement with Eastern whereby his company, Nasco Realty Services, would receive two-thirds of Eastern's $420,000 brokerage fee, or $280,000.

On September 16, 1992, Dimas wrote a letter (the "Letter") to Loukas Grammatikos ("Grammatikos"), Olympic's Director General in Athens. The Letter described an alleged conversation between Dimas and Sfouggatakis in which Sfouggatakis informed Dimas that Coliniatis was involved in a possible kickback scheme related to the transaction, under which he was demanding two-thirds of Sfouggatakis's brokerage fee. The Letter further stated that Coliniatis was planning to defraud Olympic of additional funds totalling at least $500,000. The Letter stated, in part:

I find myself professionally obligated to relay to you information of substantial but not absolute reliability suggesting a scheme to defraud Olympic of over $500,-000 by one of its trusted agents.... It seems Mr. Coliniatis expected to receive a kick-back from all of the professional arrangements entered into between Mr. Sfouggatakis and Olympic. When I spoke to him, Mr. Sfouggatakis told me that Mr. Coliniatis had told him that as a condition for obtaining these arrangements with Olympic, Mr. Sfouggatakis would be required to pay Mr. Coliniatis the first $280,-000 which Mr. Sfouggatakis received, and then to pay him 50% of all remaining money received. If this be true, Mr. Coliniatis was planning to obtain $500,000 back from Mr. Sfouggatakis. And if that be true, that number would be but the beginning of the scheme.

*See* Letter from Dimas to Grammatikos, dated Sept. 16, 1992, annexed to the Complaint as Exh. "A."

Some time after September 16,.1992, Antonis H. Diamataris ("Diamataris"), the editor and publisher of The National Herald, an eighty year old Greek language daily newspaper published in New York City, received a copy of the Letter and confirmed its authenticity. Diamataris recognized that the Letter "was a story, and a big one," and he assigned an experienced reporter, Theodore Kalmoukos ("Kalmoukos"), to cover it. During the weekend beginning September 26, 1992, Diamataris made several unsuccessful attempts to contact Grammatikos, who was in

New York investigating the allegations in the Letter.

On October 2, 1992, one day prior to publication of the Letter, Kalmoukos, at Diamataris's direction, contacted Dimas and Sfouggatakis for comment. Dimas refused to comment based on the confidential nature of attorney-client communications. Sfouggatakis denied making the statements alleged in the Letter to Dimas, and denied any involvement in the kickback scheme. Kalmoukos also attempted unsuccessfully to reach Coliniatis, who was in Greece at the time.

On October 3, 1992, The National Herald published an article entitled: " 'Kick Back' of $500,000.00, demanded the Director of O.A., charge the Lawyers of the Company" (the "Article"), containing certain statements set forth in the Letter. The first two paragraphs of the Article state:

> A huge financial scandal involving an illegal commission ("KICK–BACK"), of the magnitude of at least $500,000.00, at the expense of OLYMPIC AIRWAYS, with the Director of the Company for its North and South America Operations, Mr. Nikolaos Coliniatis, as the Protagonist, is being charged through a top secret and confidential letter to the General Director of our National Air–Carrier, Mr. Loukas Grammatikos, by the Law firm of "OLYMPIC", Dimas and Johnson. [sic]
>
> In their letter the Legal advisors of "OLYMPIC," state that "they feel professionally obligated" to relay to him information "of substantial but not of absolute reliability" suggesting a scheme to defraud OLYMPIC of over $500,000.00 by one of its "most senior and trusted representatives", to wit, Mr. Coliniatis. Specifically, the attorneys charge that Mr. Coliniatis has set as a "pre-condition" to the real estate broker, Mr. Nikolaos Sfouggatakis, to hand over to him as a "bribe", two-thirds of his commission, totalling $280,-000.00, in other words, $200,000.00, for Mr. Coliniatis himself.

Article, annexed to Def.'s Aff. in Supp. of Mot. for Summ. Judg., as Exh. "1B." The Article also includes comments by Sfouggatakis, in which he states: "I did not make any accusations about Mr. Coliniatis.... I deny it. I did not give any money; no one has asked me for any money." *Id.* In addition, the Article included a statement by Dimas declining to comment based on the confidential nature of attorney-client communications. *Id.*

Coliniatis was subsequently recalled to Greece and relieved of his duties as Olympic's Director of Operations for North and South America. On November 19, 1992, he brought this action for libel and tortious interference with employment against Dimas and Dimas & Johnston, and for libel against The National Herald.

On December 12, 1995, The National Herald brought the present motion for summary judgment dismissing the complaint against it. The motion was referred to Magistrate Judge Ellis, and on July 25, 1996, Magistrate Judge Ellis issued the Report recommending that the motion for summary judgment be denied, and that both parties' motions for sanctions pursuant to Federal Rule of Civil Procedure 11 be denied.

## II. The Report

Magistrate Judge Ellis first determined that Coliniatis is a "public official" within the meaning of *New York Times v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964). Magistrate Judge Ellis found that (1) Coliniatis had or appeared to have substantial responsibility for, or control over, government affairs; (2) the public had an independent interest in Coliniatis's qualifications and performance; (3) Coliniatis had some access to channels of communication, and thus some ability to rebut the accusations; and (4) that Coliniatis assumed the risk of greater public scrutiny.

Magistrate Judge Ellis next found that the evidence presented a jury question as to whether The National Herald acted with actual malice when it published the Article. Specifically, the Magistrate Judge determined that Coliniatis presented sufficient evidence to support a jury verdict that the purported falsehoods were published with reckless disregard as to their truth or falsity. This finding was based on the fact that The National Herald was aware that Sfouggatakis

**516**

denied the allegations and that Dimas refused to comment on the Letter. Additionally, the Magistrate Judge questioned The National Herald's decision not to attempt to contact Coliniatis until one day prior to publication of the Article. Finally, Magistrate Judge Ellis found that the fact that a National Herald reporter failed to question Coliniatis about the Letter during an interview on another subject four days prior to publication of the Article could favor a finding of actual malice.

In addition, the Magistrate Judge found that The National Herald could not avail itself of the neutral reportage doctrine articulated in *Edwards v. National Audubon Soc'y*, 556 F.2d 113 (2d Cir.), *cert. denied*, 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977). The Report states that The National Herald made a "hurried" investigation of Coliniatis's side of the issue, and that subsequent reporting of a rebuttal by Coliniatis and articles detailing Sfouggatakis's denial was too late to stop the damage inflicted by the initial publication. Additionally, the Magistrate Judge found that The National Herald failed to adduce evidence that the law firm of Dimas & Johnston is a responsible, prominent organization on a par with the National Audubon Society in *Edwards*.

Finally, the Report recommends that both parties' motions for sanctions pursuant to Federal Rule of Civil Procedure 11 should be denied. Magistrate Judge Ellis found that the record did not support the contention that either party presented papers for the purpose of harassment or to cause unnecessary delay, and that both parties staked claims warranted by existing law.

## DISCUSSION

### I. Standard for Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). If the court determines that "the rec-

ord taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial,' " and summary judgment must be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968)). On summary judgment, the court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence." *Masson v. New Yorker Magazine*, 501 U.S. 496, 520, 111 S.Ct. 2419, 2434–35, 115 L.Ed.2d 447 (1991).

Where the plaintiff is a "public official" or "public figure" in a suit for defamation, he cannot survive summary judgment unless he offers evidence of sufficient "caliber or quantity to allow a rational finder of fact" to find that the defendant published the material with "actual malice by clear and convincing evidence." *Church of Scientology Int'l v. Time Warner, Inc.*, 903 F.Supp. 637, 640 (S.D.N.Y.1995) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986)).

### II. Coliniatis's Status

Coliniatis's sole objection to the Report is its conclusion that he is a public official. Coliniatis asserts that the Report erred in finding that he had "substantial responsibility for or control over the conduct of governmental affairs." Report at 9. According to Coliniatis, he lacked direct policy-making authority because any significant policy decisions he made had to be approved by Grammatikos in Athens.

This argument is without merit. The fact that policy decisions required approval implies neither that Coliniatis played an insignificant role in formulating policy, nor that he lacked "substantial responsibility." *See Rosenblatt v. Baer*, 383 U.S. 75, 85, 86 S.Ct. 669, 675–76, 676, 15 L.Ed.2d 597 (1966). The record adequately supports the Magistrate Judge's finding that Coliniatis had substantial responsibility. Indeed, in his complaint Coliniatis states:

Plaintiff's responsibilities as the Director of Operations for North America and South America involved budgetary and financial matters, employment of vendors or service providers to Olympic, including legal counsel, purchase of advertising space, and general oversight and management of Olympic's affairs in North and South America. One of plaintiff's principal responsibilities was to reduce Olympic's operating expenditures and to make its North and South American operations profitable.

Complaint at ¶ 9. Similarly, Coliniatis described his former position as "the highest and most prestigious overseas post offered by Olympic Airways." *See* Coliniatis Certification, dated Jan. 15, 1996; *see also* Coliniatis Deposition, dated Feb. 28, 1995, annexed to Def.'s Aff. in Supp. of Mot. for Summ. Judg., as Exh. "4A," at 54.

■ Coliniatis also neglects to discuss his status in the Greek–American community, The National Herald's audience. Coliniatis testified that Olympic is "the most important corporation affecting the lives of the people in the Greek American community." Coliniatis Deposition, dated July 25, 1995, at 122–23. When an alleged libel is addressed to a particular ethnic community in its own language, as here, the plaintiff's status should be determined based on his status in that community. *See DeCarvalho v. daSilva*, 414 A.2d 806, 813–14 (R.I.1980) ("Since the publications at issue were broadcast in the Portuguese language and were aimed at a community of Portuguese–Americans, we believe it is appropriate to determine whether he was a 'pervasive public figure' … within the context of that community."). Accordingly, the Court agrees with Magistrate Judge Ellis that Coliniatis is a public official.

## III. Actual Malice

■ Where a plaintiff is a public official, he must prove "by clear and convincing evidence" that the published material is false and that defendant published the material "with actual malice, i.e., with 'knowledge that it was false or with reckless disregard of whether it was false or not.'" *Masson v. New Yorker Magazine*, 501 U.S. at 510, 111

S.Ct. at 2429 (quoting *New York Times v. Sullivan*, 376 U.S. at 279–80, 84 S.Ct. at 726); *see also Curtis Publishing Co. v. Butts*, 388 U.S. 130, 134, 87 S.Ct. 1975, 1980, 18 L.Ed.2d 1094 (1967) (public official must establish "actual malice" in accordance with *New York Times v. Sullivan* ).

■ A "reckless disregard" for the truth requires more than a departure from reasonably prudent conduct. *Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 688, 109 S.Ct. 2678, 2696, 105 L.Ed.2d 562 (1989). "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). The standard set forth by the Supreme Court is a subjective one, requiring that there be sufficient evidence to permit the conclusion that the defendant had a "high degree of awareness of … probable falsity," *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 215–16, 13 L.Ed.2d 125 (1968), or must have "entertained serious doubts as to the truth of his publication," *St. Amant v. Thompson*, 390 U.S. at 731, 88 S.Ct. at 1325. Failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard. *See id.* at 732, 88 S.Ct. at 1326.

■ The question of whether the evidence in a defamation case is sufficient to support a finding of actual malice is a question of law. *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 510–511, 104 S.Ct. 1949, 1964–65, 80 L.Ed.2d 502 (1984). This rule is premised on the fact that "[o]ur profound national commitment to the free exchange of ideas, as enshrined in the First Amendment, demands that the law of libel carve out an area of 'breathing space' so that protected speech is not discouraged." *Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. at 686, 109 S.Ct. at 2695 (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974)); *see also NAACP v. Button*, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963); *New York Times v. Sullivan*, 376 U.S. at 272, 84 S.Ct. at 721–22. Although the

precise meaning of terms such as "actual malice" and "reckless disregard" are elusive, these terms can be given content through an analysis of applicable case law. Given the risk that the ambiguity inherent in these terms may result in discouraging protected speech, "[j]udges, as expositors of the Constitution," have a duty to "independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.'" *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. at 511, 104 S.Ct. at 1965.

■ The Court disagrees with the finding of the Magistrate Judge that the evidence could support a jury finding that The National Herald published the Article with "actual malice." Specifically, the Court finds that Coliniatis has not met his burden of demonstrating that a reasonable fact-finder could find actual malice with "convincing clarity." *Herbert v. Lando*, 781 F.2d 298, 305 (2d Cir.), *cert. denied*, 476 U.S. 1182, 106 S.Ct. 2916, 91 L.Ed.2d 545 (1986); *see also Anderson v. Liberty Lobby*, 477 U.S. 242, 255–56, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986) ("where the factual dispute concerns actual malice ... the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not").

The Report states that The National Herald might be found liable because in its investigation of the claims it uncovered Sfouggatakis's denial of the accuracy of the Letter and Dimas's refusal to comment based on the attorney-client privilege. This information is insufficient to meet the requisite showing of clear and convincing evidence of actual malice necessary to survive summary judgment.

In *Sweeney v. Prisoners' Legal Services, Inc.* and *Murphy v. Battle,* New York courts dismissed claims where plaintiffs failed to provide clear and convincing evidence of actual malice. *Sweeney v. Prisoners' Legal Services of New York, Inc.*, 84 N.Y.2d 786, 622 N.Y.S.2d 896, 647 N.E.2d 101 (1995) (dismissing correction officer's claim that he was defamed by allegations that he abused prisoners because "[t]here was no direct evidence that defendants were aware that [the] claim against [defendant] was false" and as a result he could not establish actual malice); *Murphy v. Battle*, N.Y.L.J., Sept. 10, 1993, at 25 (S.Ct. Duchess County, Sept. 10, 1993) (no evidence that the defendant, Amsterdam News, entertained serious doubts as to allegations that a prison guard was abusing inmates).

The Magistrate Judge faults The National Herald for (1) failing to attempt to contact Coliniatis until one day before publication; and (2) failing to inquire into the subject matter of the Article during an interview with Coliniatis four days before publication. These incidents are not evidence of a "reckless disregard of truth or falsity" under established law, and are not indicative of an intent to avoid the truth. In both *Sweeney* and *Murphy*, the defendants conducted no investigations into the allegations. These total failures to inquire into the claims were condoned, despite the fact that both cases involved complaints by convicted felons about their guards. Thus, in *Sweeney*, the court held that a failure to investigate cannot by itself be actionable "unless it evidences an intent to avoid the truth." *Sweeney v. Prisoners' Legal Services, Inc.*, 84 N.Y.2d at 793, 622 N.Y.S.2d 896, 647 N.E.2d 101.

Similarly, in *Sands v. News America Publishing, Inc.*, —— A.D.2d ——, 655 N.Y.S.2d 18, 19 (1997), the Appellate Division found that "[o]n the issue of malice, plaintiff failed to submit evidence of 'convincing clarity' that defendants were aware that the article was probably false, and, accordingly, summary judgment was properly granted." In that case, the plaintiff contacted the reporter prior to publication and denied related allegations. The court found that this denial did not constitute clear and convincing evidence of malice. As in these cases, the Court finds that the plaintiff has failed to adduce clear and convincing evidence of actual malice and there is no evidence that The National Herald intended to avoid the truth in its publication of the Article.

■ Furthermore, the Court is not persuaded by plaintiff's argument that Sfougga-

takis's denial that a bribery request had been made should have alerted The National Herald to the falsity of the allegations in the Letter. Emphatic denials are part of the landscape of journalism, and a decision to print a story in the face of such a denial, particularly where, as here, it comes from an interested protagonist, does not establish clear and convincing evidence of malice. In the words of *Edwards:*

> It is conceded that the Times might have published the Audubon Society's accusations without fear of liability had Devlin but refrained from eliciting the views of the Society's victims. The appellees would punish the Times for its effort to confirm the story, apparently maintaining that a little prudence is a dangerous thing.... Surely liability under the "clear and convincing proof" standard of *New York Times v. Sullivan* cannot be predicated on mere denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error.... Accordingly, even if the Times were required to assume direct responsibility for the accusations, it could not, consistent with *New York Times v. Sullivan,* be found liable for defamation.

*Edwards v. National Audubon Soc'y,* 556 F.2d at 121; *see also Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. at 691 n. 37, 109 S.Ct. at 2698 n. 37 (press need not reflexively accept denials).

Coliniatis relies primarily upon *Harte–Hanks Communications, Inc. v. Connaughton,* in which the United States Supreme Court upheld a jury verdict for libel in favor of a candidate for judicial office against a newspaper. In that case, however, the plaintiffs presented strong, non-speculative evidence that the defendant newspaper intended to avoid the truth. For example, unlike the present case, the newspaper failed to disclose any of the facts which could have given rise to serious doubts of the accuracy of the report. In addition, the newspaper failed to make any attempt to interview a key witness or listen to crucial tapes which were available to it.

Because the Court finds that the plaintiff has not presented evidence of sufficient caliber to allow a rational fact finder to determine that The National Herald published the material with actual malice by clear and convincing evidence, The National Herald's motion for summary judgment dismissing the claim against it is granted.

## IV. The Neutral Reportage Doctrine

■ The National Herald seeks dismissal on the alternative ground that the Article is protected by the neutral reportage privilege articulated by the Second Circuit in *Edwards v. National Audubon Soc'y,* 556 F.2d 113 (2d Cir.), *cert. denied,* 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977). In that case, the Court dismissed a complaint where a journalist "believe[d], reasonably and in good faith, that his report accurately convey[ed] the charges made." The *Edwards* privilege has been limited to those instances where the defendant publishes a defamatory statement in the context of (1) "an accurate and disinterested report"; (2) regarding a newsworthy controversy; (3) in which the defamatory statement was made by a "responsible, prominent organization"; and (4) provided that the statement is not endorsed by the publisher. *Levin v. McPhee,* 917 F.Supp. 230, 239 (S.D.N.Y.1996) (citing *Edwards v. National Audubon Soc'y,* 556 F.2d at 120).

■ In light of the potential publication of baseless allegations proffered by others, the Second Circuit has noted the need to circumscribe the breadth of the neutral reportage privilege. Accordingly, the Court has placed clear limits on the reach of the privilege, stating: "It is equally clear ... that a publisher who in fact espouses or concurs in the charges made by others, or who deliberately distorts those statements to launch a personal attack of his own on a public figure, cannot rely on a privilege of neutral reportage." *Edwards v. National Audubon Soc'y,* 556 F.2d at 120; *see also Cianci v. New Times Publishing Co.,* 639 F.2d 54, 69–70 (2d Cir.1980).

■ Applying these principles to this case, the Court finds that the Article is also protected by the neutral reportage doctrine.

**520**

First, the Article is accurate and disinterested. Everything stated in the Article is true: the Letter was written, the Letter's liberally quoted contents are fully and accurately described, The National Herald's investigation of the allegations is fully described, and the denial of Sfouggatakis and the refusal to comment by Dimas are described. Second, the Article adopts the admonitions and hedging language in the Letter, including that the allegations were "plausible but unproven" and "of substantial but not absolute reliability." There is no evidence that The National Herald subscribed to any of the charges in the Letter, or distorted the allegations in the Letter in any way. Rather, the Article is well-balanced and neutral, with a full description of what information is lacking or disputed. Even the headline of the Article states that the allegations are made by "lawyers of the company." [2]

The Court also finds Dimas & Johnston to be a "responsible, prominent organization" within the meaning of *Edwards*. The "responsible, prominent organization" requirement of the neutral reportage doctrine acts as a proxy for determining when the very fact that allegations are made is itself newsworthy, *see Levin v. McPhee*, 917 F.Supp. at 239, as well as an indication that a report is likely to be reliable to insure that an irresponsible republisher of unsupported allegations cannot hide behind the aegis of the privilege. Both policies are satisfied here. Given the Greek–American community's interest in Olympic, it is newsworthy that the company's own counsel made such allegations. *See Edwards v. National Audubon Soc'y*, 556 F.2d at 120 ("What is news-worthy about such accusations is that they were made. We do not believe that the press may be required under the First Amendment to suppress newsworthy statements merely because it has serious doubts regarding their truth."). The firm's status with respect to Olympic also provides a certain degree of trustworthiness. Thus, the essential policies behind the requirement are satisfied. *See In re United Press Int'l*, 106 B.R. 323 (D.D.C.1989) (republication of allegations by the brother of a missing individual satisfies the neutral reportage doctrine where report was neutral and disinterested, since limiting the doctrine to more " 'responsible' or 'prominent' defamers is inconsistent with the raison d'etre of the doctrine"); *see also Barry v. Time, Inc.*, 584 F.Supp. 1110, 1126 (N.D.Ca.1984) (because of the public interest in being informed of controversies and the potential chilling effect on the press, neutrality of reporting is of more significance than trustworthiness of the source in satisfying the requirement).[3] Accordingly, the Court finds that the Article is protected by the neutral reportage doctrine.

## V. Rule 11 Sanctions

Neither party objects to the Magistrate Judge's recommendation that the motions for Rule 11 sanctions be denied. The Court has considered this aspect of the Report and determines that there is no clear error on the face of the record. Because the Court agrees with the recommendation that sanctions are not warranted, both motions for Rule 11 sanctions are denied.[4]

---

2. Coliniatis also asserts that The National Herald endorsed the Letter and involved itself as an interested and biased party. This assertion, however, is not based on any statement in the Letter itself, but refers to a subsequent editorial response not the subject of this litigation.

3. Because the Court finds that no reasonable trier of fact could find that Coliniatis has provided clear and convincing evidence that The National Herald acted with actual malice, and in any event, that the Article is protected by the neutral reportage privilege, the Court need not address The National Herald's additional contention that the Article is protected by New York State Law.

4. The National Herald relies on a recent decision by a Greek court regarding a parallel action in which Coliniatis's claims were dismissed. The National Herald claims that the Greek court's determination that Coliniatis "did not exercise appropriate diligence" and hence, "there was an important reason for terminating" his employment contract contradicts Coliniatis's claim that publication of the Article destroyed his career. Because The National Herald does not suggest, and the Court cannot perceive how this matter is relevant to any issue presently before the Court on this motion for summary judgment, this decision has not been considered.

## CONCLUSION

For the reasons set forth above, The National Herald's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 dismissing the complaint against it is granted.

SO ORDERED.